**Debra SHAW, Plaintiff,**

v.

**THE MCFARLAND CLINIC, P.C., Defendant.**

**No. 4:01–CV–90325.**

United States District Court, S.D. Iowa, Central Division.

Oct. 11, 2002.

Zorica Ilic, Des Moines, IA, for Plaintiff.

Michael W. Thrall, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Debra Shaw, brings this action alleging an improper denial of health benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, against her employer in its capacity as administrator of her employer funded health benefits plan. Both sides have filed motions for summary judgment, and neither has requested oral argument. The matter is fully submitted. For all the reasons set forth below, Defendants' motion is denied. Plaintiff's motion is granted.

## I. BACKGROUND

### A. Introduction

Plaintiff Debra Shaw possesses the dubious distinction of being Iowa's last polio victim. Born in 1957, Ms. Shaw contracted poliomyelitis at nineteen months of age in June 1959. The tragically crippling effect of the illness left her with a severely deformed and virtually useless left calf. Her left leg is also now slightly shorter than her right leg. Shaw has undergone a variety of reconstructive surgeries in attempt to regain some functionality in her leg. These procedures have provided enough increased strength to allow for walking and light physical activity, but the calf dysplasia continues to inhibit her balance and gait, she continues to suffer from knee, ankle, and lower back pain. In addition to the physical limitations, Shaw's deformity has caused her significant emotional distress over the years.

Defendant, the McFarland Clinic, P.C. (McFarland), is central Iowa's largest physician-owned multi-specialty clinic, and is Plaintiff's employer. To provide its employees with health care coverage, McFarland sponsors an employer funded health

benefits plan. The summary plan description lists McFarland as the plan's administrator, but McFarland has delegated the majority of its duties as administrator to a third-party administrator, Health Alliance Medical Plans (HAMP). HAMP handles the day to day administration of the plan, determines claim eligibility, and handles participant appeals after denying claims.

In September 1997, Plaintiff was seen in consultation by Dr. Marie E. Montag, M.D. of Heartland Plastic & Reconstructive Surgery P.C. in Des Moines, Iowa, regarding tissue expander reconstruction of her deformed calf. On September 24, Dr. Montag wrote to HAMP requesting preauthorization for the calf reconstruction procedure. HAMP denied the initial claim and Shaw's subsequent appeals. Ms. Shaw now seeks relief in this Court.

## B. Tissue Expander Reconstruction Surgery

Calf implantation was originally developed in the early 1960s as a means of "correcting unilateral defect of the legs secondary to poliomyelitis, clubfoot, or Charcot–Marie–Tooth disease." Adrien Aiache, M.D., *Leg Contouring with Calf Implants*, 23–4 *Clinics in Plastic Surgery* 737, 737–38 (1996). Difficulties regarding the shape and fabrication of the implants, as well as infection caused by the silicone sponge style implants led to surgeons quickly abandoning the procedure. *Id.* at 738. In 1979, however, the process was revived independently by Drs. Glitzenstein and Carlsen. *Id.* Until the mid-eighties, the procedure remained "reserved for patients with developmental problems secondary to polio myelitis, talipes equinus, and posttraumatic atrophy." Adrien E. Aiache, M.D., *Calf Implantation*, 83–3 *Plastic and Reconstructive Surgery* 488, 488 (1989). As the procedure became standardized through the use of silicone gel implants, one leading surgeon reassured fellow doctors that they could make use of their experience with breast implants to develop the necessary techniques for calf augmentation. Laszlo von Szalay, M.D., *Calf Augmentation: A New Calf Prosthesis*, 75–1 *Plastic and Reconstructive Surgery* 83, 85 (1985). In the late eighties, the technique moved beyond developmental and post traumatic reconstruction, and into the realm of aesthetic enhancement, predominately for bodybuilders seeking a quick solution to undersized calf muscles. Today, calf implantation is regarded as plastic surgery's most direct and simple technique for leg improvement. Aiache, *Leg Contouring with Calf Implants* 23–4 *Clinics in Plastic Surgery* at 737.

In polio victims, the reconstruction of the calf is a two step process, as the nature of the deformity requires the use of special techniques such as tissue expanders. *Id.* at 740. First tissue expansion is performed to allow the body to grow extra skin. The American Society of Plastic Surgery offers the following explanation of tissue expansion: "a silicone balloon expander is inserted under the skin near the area to be repaired and then gradually filled with salt water over time, causing the skin to stretch and grow. It is most commonly used for breast reconstruction following breast removal-but it's also used to repair skin damaged by birth defects, accidents or surgery, and in certain cosmetic procedures." *Tissue Expansion Plastic Surgery* (visited Oct. 1, 2002) <http:// www.plasticsurgery.org/surgery/ reconstructive/ tissue_expansion/tissue_expansion.cfm>. The second step is the standardized procedure of inserting soft implants into the calf. The result is a calf with added definition and weight, and in polio patients, bi-lateral uniformity. Aiache, *Calf Implantation*, 83–3 *Plastic and Reconstructive Surgery* at 490–492.

## C. The Plan

The purpose of the McFarland Clinic, P.C. Health Benefit Plan (the Plan) is to offer its participants "a broad range of healthcare coverage through an extensive network of healthcare providers; plus the freedom to use any provider of your choice and still receive medical coverage," and to "provide you and your eligible family dependents with medically necessary healthcare services and programs." Def.App. 9. As well, the Plan provides that the Administrator shall construe the terms of the Plan and determine eligibility for benefits in a non-discriminatory manner. Def.App. 8. Before obtaining benefits under the Plan, the Plan requires that participants submit a request for preauthorization to HAMP. "Preauthorization allows the registered nurses and Medical Directors of the Health Alliance Medical Management Department to evaluate the medical appropriateness of services and provides you with assurance that the hospitalization or procedure is medically necessary and will be covered by the plan." Def.App. 11. When Plan participants submit preauthorization requests, the Plan is silent as to the specific review undertaken. The terms of the Plan, however, suggest but one logical method.

The Plan has one section listing what is covered under the plan and another section listing what is not covered. The Plan's motif and oft repeated mantra is that for services to be covered, they must be medically necessary. Under "What is Covered," the Plan states that coverage includes "inpatient hospital charges, physician visits, emergency care, preventive care *and most other medically necessary expenses.*" Def.App. 18 (emphasis added). If the Plan covers most other medically necessary expenses, some medically necessary expenses are necessarily not covered under the Plan. Accordingly, the Plan excludes coverage for experimental treatments/procedures/transplants, care arising out of illegal activities,[1] and the treatment of obesity or morbid obesity without regards to medical necessity. Thus, the first step in determining whether the Plan provides coverage references the preauthorization request with the Plan's list of what is not covered.[2] If the procedure matches one of the excluded items, the medical necessity of the procedure is irrelevant, the inquiry is complete, and the claim is

---

1. A January 1, 1998, amendment to the Plan removed this exclusion.

2. The first step might logically seem to be referencing the "What's Covered" section, but this is erroneous. ERISA requires that a summary plan description contain "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). Moreover, upon denying a claim ERISA requires the plan administrator to notify the participant of the specific reason and specific provision in the plan causing for denial. 29 U.S.C. § 1133(1); 29 C.F.R. 2560.503–1(f)(1)–(2) (1984) (amended 2000, 2001). As discussed below, the distinction is irrelevant in this case, denial simply because the procedure is not included in a plan's list of covered items runs afoul of the ERISA's disclosure and notice requirements. The Plan here reflects this analysis. In large part, the Plan attempts to describe excluded items with a greater measure of precision than it whereas included items are more broadly addressed. The purpose of the covered items section, however, is unclear. Assuming the Plan had no initial intentions of violating ERISA's provisions, the Court sees two possibilities: 1) the covered items are a general explanation of plan benefits designed to demonstrate to plan participants what expenses the plan will deem medically necessary; or 2) the covered items are to be read as exceptions to the excluded items. The second option seems highly unlikely as the covered section lists such basic medical expenses as physician office benefits. Thus, the Court is left to conclude the listing of services in the "What is Covered" section is essentially informative, but neither instructive nor controlling.

denied. Relevant to this case, the Plan excludes:

> **Cosmetic surgery.** Surgery which is indicated primarily for cosmetic purposes such as skin tags, lipomas, rhinoplasties, breast reductions blepharoplasties, mandibular and maxillary osteotomies, dermabrasion and liposuction is not covered.

Def.App. 24.

If a claim is not specifically excluded from coverage, the preauthorization request must still be deemed medically necessary before being approved. The Plan obfuscates this determination, however, by offering two different definitions of medically necessary, and yet a third inverse definition of medically unnecessary. Initially, under "What Is Covered," the Plan defines medically necessary as:

> A service or supply which is required to identify or treat a beneficiary's condition is the sole judgment of a Health Alliance Medical Director and is: (1) appropriate and necessary for, and consistent with, the symptom or diagnosis and treatment or distinct improvement of an illness or injury; (2) in accordance with standards of good medical practice, uniformly recognized and professionally endorsed by the general medical community at the time it is provided; (3) not mainly for the convenience of the beneficiary, a physician or other provider; and (4) the most appropriate medical service, supply, or level of care which can safely be provided. When applied to inpatient care, it further means that the beneficiary's medical symptoms or condition require that the services cannot be safely provided to the beneficiary as an outpatient.

Def.App. 19.

In the "Definitions" section of the Plan, the definition is repeated, except that the definition confers sole judgment not on the Health Alliance Medical Director, but on the Health Alliance Medical Management Department. Def.App. 35. The inverse definition under what is not covered is surplusage and irrelevant. The difference between the two definitions, however, is significant. The Plan defines both terms.

> **Health Alliance Medical Director** means the physician or physicians given authority by the Plan Administrator to determine medical necessity of benefits.
> **Health Alliance Medical Management Department** means the healthcare professionals authorized by the Plan Administrator to monitor and authorize utilization of Plan benefits in accordance with the Plan Document and **SCHEDULE OF BENEFITS.**

Def.App. 35 (emphasis in original).

As noted above, preauthorization is determined by both the registered nurses and the medical directors of the Health Alliance Medical Management Department. The difference in definitions leaves a plan participant, and this Court bewildered as to who determines medical necessity, and whether that person is the one authorized to do so by the plan administrator.

## D. HAMP and McFarland's Denial of Ms. Shaw's Claim

The Administrative Record Claim of Debra Shaw provides the history of Ms. Shaw's claim, and, coupled with the Plan summary description, represents the full body of evidence submitted by the parties in this case. As noted above, Dr. Montag submitted a letter requesting preauthorization for calf reconstruction surgery on September 24, 1997. In her letter Dr. Montag wrote: "Ms. Shaw feels that her deformity is so obvious, that she does not feel comfortable wearing shorts or a skirt and is simply looking for a more symmetric appearance of her leg."[3] Def. App 38.

---

**3.** The letter, as reproduced for the Court, ends abruptly after a technical paragraph de-

In an unsigned letter dated December 15, 1997, HAMP denied the claim. In its entirety the denial letter reads:

Dear Debra Shaw:

At your request, Health Alliance reviewed your request for pre—authorization for Tissue Expander Reconstruction of a left calf deformity.

We have received a letter from Dr. Marie Montag. Based on review of this letter the surgery would be considered cosmetic and therefore, is not covered on your plan.

If you have any questions or wish to submit additional information for review, please call or write to the Medical Management Department at the address and phone number listed below.

Marge Brown R.N.

1202  Duff Ave.

Ames, IA. 50010

1–888–805–8150

Def. App 48.

As Shaw was consulting with Dr. Montag regarding reconstructive surgery, she was also scheduled to undergo another surgical procedure to lengthen her left leg. Desiring a second opinion about the lengthening surgery, Shaw visited Dr. James Nepola of the University of Iowa Hospitals Orthopaedic Surgery Department on October 13, 1997. Dr. Nepola recommended and prescribed a custom shoe-lift as an alternative to the lengthening surgery. On December 16, 1997 HAMP denied this claim as well.[4] The denial letter, signed this time by HAMP Associate Medical Director James Burke, M.D., stated:

Dear Ms. Shaw:

Health Alliance has reviewed your request for shoe lifts. However, we are unable to cover shoe lifts as they are not a covered benefit under your plan.

Should you have further questions regarding this decision, please contact the Health Alliance Medical Management Department at 515–233–0211/888–805–8150.

Def. App 49.

Shaw appealed HAMP's denial of coverage for calf reconstruction to HAMP's Medical Directors' Committee. In a January 9, 1998 letter, Dr. Montag requested that HAMP reconsider its initial denial, stating:

The rejection of this preauthorization was based on your conclusion that this would be a cosmetic procedure solely. I do concede that placement of calf implants would indeed improve her cosmetic appearance, but this increased weight and volume of the affected leg would also improve her balance and thereby cause an improvement in her gait overall. Ms. Shaw has had problems with pain in the left ankle and knee as well. These are quite probable due to abnormal stresses on these areas due to her asymmetric balance and these symptoms also could be helped by placement of prosthetic implants.

Def.App. 50.

As well, Shaw herself submitted a personal letter requesting HAMP reconsider its decision. Finally, two of Defendant's own practitioners, Terry L. McGeeney, M.D., and Diane M. Cardwell, PA–C petitioned HAMP to reconsider its decision, noting:

---

scribing Ms. Shaw's leg without any closing or signature. Dr. Montag's second letter, however, ends properly. Alas, neither party raised the issue, and the Court is left to ponder whether the entire administrative record was actually reproduced before it.

4. Under "What is Not Covered" the plan lists "Orthotics, orthopedic shoes and devices including heel cups, arch supports, gloves, lifts and wedges are not covered. However, specially molded, custom-made orthotics are a covered benefit." Def.App. 25.

It has been called to my attention that under the Health Alliance Medical Plan there is reimbursement for cosmetic implant secondary to a medical condition, i.e. breast implants after breast CA; and I feel that this is a comparable situation, therefore there should be reimbursement for this procedure.

Def.App. 51.

The administrative record shows that on February 11, 1998, HAMP informed Shaw by telephone that the Medical Director's Committee had denied her appeal because the procedure was considered cosmetic. Def.App. 60. Two weeks later, HAMP sent written notice of the denial. The written denial letter, however, offered a different explanation for the denial. Once again in its entirety, the February 25, 1998 denial letter again signed by James Burke states:

Dear Ms. Shaw:

Health Alliance has received an inquiry regarding the eligibility of coverage for your calf implant. Because this procedure is not a basic health care service and is not considered medically necessary, it is not a covered benefit under your plan. Coverage criteria of services is explained in detail in your Health Alliance membership materials.

The Customer Service Department, 1-888-536-5300, is available to answer any questions you may have regarding the charges for which you will be responsible should you elect to have this procedure.

Please refer to your Health Alliance membership materials for information, or contact the Health Alliance Medical Management Department at 515-233-0211 or 1-800-805-8150.

Def.App. 54.

After HAMP denied her appeal, Shaw appealed her claim to McFarland's Administrative Committee on April 2, 1998. McFarland denied Shaw's appeal. On May 21, 1998, McFarland sent HAMP the following letter.

Deb Shaw, a McFarland employee and HAMP enrollee, requested that the Clinic intervene in HAMP's denial of her left calf augmentation and shoe lift. The matter was reviewed by the Clinic's Administrative Committee. They did not recommend reconsideration of the left calf augmentation however determined that shoe lifts should be provided to Ms Shaw. Could you see that her previously denied claim and future claims for shoe lifts are handled accordingly.

Thank you for your attention to this matter.

cc Deb Shaw

Def.App. 56.

Other than a courtesy copy of the above letter to HAMP, Shaw received no other notice of McFarland's denial of her final administrative appeal.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 Moore's Federal Practice 3d, § 56.02, pg. 56–20 (Matthew Bender 3d ed.1997) (citing *Wynne v. Tufts Univ. School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), cert. denied, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)).

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *City of Columbia,* 914 F.2d at 153; *Woods-*

mith Publ'g, 904 F.2d at 1247. The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In the present case, both parties agree that there are no material facts in dispute and that disposition by summary judgment is proper.

## III. CLAIMS AND STATUTES OF LIMITATIONS

Unsurprisingly, Plaintiff's motion for summary judgment argues that the record shows that Defendant improperly denied her claim under ERISA and the terms of the Plan, whereas Defendant's motion and resistance argues that its decision to deny Shaw's claim was proper under the Plan and ERISA. McFarland, however, raises two other objections that the Court must resolve before it can address the substantive question; that Plaintiff's motion improperly asserts a breach of fiduciary duty; and that Plaintiff's entire claim is barred by a two-year statute of limitations. Because of its all-encompassing nature, the Court will address the statute of limitations question first.

### A. Statute of Limitations

■ Because ERISA contains no statute of limitations, the task before the Court is to "characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate limiting principle." *Robbins v. Iowa Rd. Builders Co.*, 828 F.2d 1348, 1353 (8th Cir.1987) (quoting *Wilson v. Garcia*, 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). Restated, the Court "borrows" the Iowa statute of limitations most analogous to Plaintiff's claim. *Duchek v. Blue Cross & Blue Shield*, 153 F.3d 648, 649 (8th Cir.1998). Although such a determination consequently relies on state law to limit a federal claim, characterizing the federal claim is undoubtedly a question of federal law derived from the elements of the claim and Congress' purpose in providing it. *Robbins*, 828 F.2d at 1353 (citing *Wilson*, 471 U.S. at 268–69, 105 S.Ct. 1938). What then is the essence of Plaintiff's claim? Generically, Shaw's claim is one by a plan participant or beneficiary to "recover benefits due [her] under the terms of his plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits." 29 U.S.C. § 1132(a)(1)(B). Adding necessary precision, Shaw's claim alleges that, in its capacity as administrator of her health bene-

fit plan, her employer McFarland, abused its discretionary authority and improperly denied her preauthorization request for coverage under the Plan. With this characterization in place, the Court turns to Iowa law to determine the most analogous statute of limitations.

McFarland argues that Shaw's claim is barred under the two-year statute of limitations of the Iowa Wage Payment Collection Act (IWPCA). Iowa Code § 91A, Iowa Code § 614.1(8). Iowa Code § 614.1(8) limits to two years, "claims for wages or for a liability or penalty for failure to pay wages." The IWPCA defines "wages" as:

"Wages" means compensation owed by an employer for:

a. Labor or services rendered by an employee, whether determined on a time, task, piece, commission, or other basis of calculation.

. . .

d. *Expenses incurred and recoverable under a health benefit plan.*

Iowa Code § 91A.2(7) (emphasis added).

Defendant further cites *Mead v. Intermec Technologies Corp.,* 271 F.3d 715 (8th Cir.2001), as controlling authority. In *Mead,* a former employee brought an ERISA action to recover short-term disability benefits from his former employer. *Mead,* 271 F.3d at 716. Without discussion, the circuit affirmed the district court's conclusion that "Mead's claim fell within the Iowa Wage Payment Collection Act and was barred by the two-year statute of limitations." *Id.* at 717 Defendant concedes that *Mead* involved short-term disability, but argues that the case, and more importantly the IWPCA's two-year statute of limitations, is controlling here as well. Although McFarland's argument is persuasive at first glance, it fails under closer scrutiny.

The singular purpose of the IWPCA is "to facilitate the collection of wages by employees" from employers. *Kartheiser v. American Nat. Can Co.,* 271 F.3d 1135, 1136 (8th Cir.2001); *Condon Auto Sales & Service, Inc. v. Crick,* 604 N.W.2d 587 (Iowa 1999) amended on denial of rehearing. *See Williams v. Davenport Communications Ltd. Partnership,* 438 N.W.2d 855, 857 (Iowa App.1989) adding "after they leave a job" to the purpose of the IWPCA. *See also Massachusetts v. Morash,* 490 U.S. 107, 109–10, n. 2 110, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (noting similarity between IWPCA and Massachusetts statute requiring employers to pay discharged employee full wages). A review of the chapter sections reveal a scheme to regulate the payment of wages for services which have been performed. *McClure v. International Livestock Improv. Serv. Co.,* 369 N.W.2d 801, 803 (Iowa 1985). Regarding expenses, the act limits its scope to those "which are authorized by the employer and incurred by the employee." Iowa Code § 91A.3(6). Applying the purpose and guiding principles to Plaintiff's claim clearly shows the IWPCA is not a proper analogy.

Under ERISA, either a plan participant or a beneficiary may bring an action against the plan's administrator challenging the latter's claim denial. Although the parties in this case share an employee-employer relationship in addition to their participant-administrator relationship, this is often not the case. A plan beneficiary could sue a third party administrator and neither an employee nor an employer would be involved. A claim against a plan administrator alleging the administrator abused its discretion is just that, a claim against the plan administrator regardless of any other relationships between the parties. Applied to this case, Shaw sued her employer, not as her employer, but to challenge McFarland's denial of her claim in its capacity as plan administrator. This is

not an employee seeking to recover earned wages from an employer.

The definition Defendant relies on further distances Plaintiff's claim from the IWPCA. As noted, wages includes "expenses incurred and recoverable under a health benefit plan," and the IWPCA regulates expenses "which are authorized by the employer and incurred by the employee." Iowa Code § 91A.2(7), 91A.3(6). The definition and regulation is consistent with the rest of the wage collection act and the notion of wages in general. Wages are "compensation given to a hired person for his or her services." *Black's Law Dictionary,* (6th ed.1990). Inversely, and subject to an agreement between the employer and employee, one expects wages to compensate for his or her services, and does not expect to receive wages for services not requested, authorized, or performed. Applying this logic to expenses, one expects to be reimbursed for expenses only as authorized and incurred for services performed. Furthermore, the IWPCA conjunctively defines expenses under a health benefit plan as incurred *and* recoverable, not incurred *or* recoverable. Thus, expenses under a health benefit plan are not wages unless they are both incurred and recoverable. i.e. authorized and incurred.

The IWPCA seeks to facilitate the collection of wages by employees in disputes with employers. In such a dispute, the employee is seeking payment for services rendered. Restated, the employee simply wants to recover the paycheck he expected for working, and that the employer has refused to provide. In the case of expenses, the employee's wage dispute simply asks the employer to reimburse her for those expenses incurred per the employer's request or with the employer's blessing. The wage collection act does not provide a remedy for wages the employee has not earned, nor does it provide an opportunity to collect expenses that were never authorized or incurred. Plaintiff's claim is that McFarland improperly denied her request for coverage *preauthorization.* As Plaintiff's requests were never authorized, no expenses were ever incurred under her health benefits plan. Thus, Plaintiff's claim is not a claim for wages and does not fall within the purview of the IWPCA.

The Court holds that an individual ERISA claim challenging a plan administrator's decision to deny preauthorization is not governed by the two-year statute of limitations for wage claims as such a claim is neither for wages, nor is it a claim between an employer and an employee for the collection of wages. In searching for an analogous state statute of limitations, one expects that, notwithstanding ERISA, the plaintiff would have a cause of action under the law described in the statute of limitations. Here, Plaintiff has no such claim under the IWPCA. Rather, Plaintiff's claim most closely resembles an insured party's claim against his insurer for denial of coverage and breach of the insurance contract. Under Iowa law, the limit for bringing a claim alleging breach of an insurance contract is the same as for breach of any written contract, ten years. *Hamm v. Allied Mut. Ins. Co.,* 612 N.W.2d 775, 783–784 (Iowa 2000); Iowa Code § 614.1(5). Plaintiff's claim is well within this period.

**B. Breach of Fiduciary Duty**

In her motion for summary judgment, Plaintiff states "Plaintiff filed her Petition alleging breach of fiduciary duty under 29 U.S.C. § 1001 et. al. [sic]." Defendant argues that any claim for breach of fiduciary duty must be dismissed because: 1) Plaintiff has not before pleaded a breach of fiduciary duty claim; 2) ERISA provides Plaintiff with no individual claim for mone-

tary damages for a breach of fiduciary duty; and 3) if Plaintiff has a claim, it is time-barred under ERISA's statute of limitations, 29 U.S.C. § 1113. The Court agrees with some, but not all of these arguments.

A fiduciary[5] is "a person having duties involving good faith, trust, special confidence, and candor," "created by his undertaking, to act primarily for another's benefit." *Black's Law Dictionary* 625 (6th ed.1990). ERISA identifies a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). By definition, a fiduciary has a duty to act for the benefit of another; a fiduciary does not exist in a vacuum. The nature of the relationship between the fiduciary and the person on whose benefit the fiduciary is to act determines the scope of the duty. In the context of ERISA welfare benefit plans the relationship is potentially two-fold. First, the fiduciary owes a duty to act for the benefit of the plan; that is for the benefit of the participants and beneficiaries as a collective body.

ERISA explicitly recognizes and prescribes the extent of the fiduciary's duty to the plan. *See* 29 U.S.C. § 1101 et seq. In so doing, the Act acknowledges the precious nature of the fiduciary trust relationship, and seeks to prevent unscrupulous fiduciaries from abusing the relationship to the detriment of the plan participants. *Id.* Accordingly, the Act provides for a cause of action to challenge a fiduciary's breach of its duty to the plan, and further provides that a fiduciary may be personally liable to the plan for actions that have harmed the plan. 29 U.S.C. § 1109, 1132(3). Such a suit is essentially similar to a shareholder derivative suit where an individual shareholder, on behalf of an entire corporation, brings a claim against one who has breached a fiduciary duty owed to the corporation. In such a case, the suit and any recovery is for the benefit of the corporation, not the individual shareholder. In the context of ERISA, an action for the breach of a fiduciary duty owed to the plan is brought by an individual participant, beneficiary, or the Secretary of Labor. As in the shareholder suit, ERISA provides that any monetary recovery is for the benefit of the plan, not the individual plan participant.[6] 29 U.S.C § 1109; *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Suits for a breach of this duty are subject to an express six or three year statute of limitations. 29 U.S.C. § 1113.

When the ERISA plan fiduciary's discretionary authority extends to the determination of individual claims, the fiduciary owes a second duty to the plan participants as individuals. Although the Act does not title individual sections with the intent of identifying the individual fiduciary relationship, a plan administrator with discretionary authority to interpret the plan and determine the validity of claims is certainly a fiduciary within the Act's definition. Accordingly, ERISA sets forth a panoply of standards, rules, and regulations relating to the administrator's duty

---

5. The editors of the *American Heritage College Dictionary* include the word "fiduciary" in their recently published list *100 words that all high school graduates-and their parents-should know.* <http://www.houghtonmifflin-books.com/ booksellers/press_release/ahdcollege/atof.shtml> (last visited October 9, 2002).

6. The Supreme Court has held that § 1132(a)(3) provides an individual right to equitable relief for a fiduciary's breach of its duty to the plan. *Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

to the plan participants. In such a case, the relationship is similar to a contractual trust relationship with the fiduciary acting as trustee and the individual participant the beneficiary. See *Varity Corp.,* 516 U.S. at 513–15, 116 S.Ct. 1065; *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–14, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Accordingly, the fiduciary has a good faith duty to process and review a plan participant's individual claim in accordance with the terms of the plan and the law. Failure to do so is a breach of this duty. Furthermore, where the fiduciary violates its duty to the individual under the terms of the plan, ERISA provides a private cause of action for the plan participant or beneficiary to "recover benefits due to him under the terms of his plan," and to "enforce his rights under the terms of the plan" 29 U.S.C. § 1132(a)(1)(B). In such a case, although the ultimate dispute likely involves money, the nature of the relationship between the participant and the fiduciary is not pecuniary. The available remedies are, therefore, equitable rather than pecuniary in nature. As detailed below, ERISA provides no statute of limitations for this duty.

▇▇ Certainly McFarland's sole discretionary authority to "determine all questions arising in the administration of this plan" qualifies Defendant as a fiduciary under ERISA. Def.App. 8. Because the duty involves both the administration and management of plan funds as well as plan interpretation and application to individual claims, Defendant owes its fiduciary duty to both the Plan as a collective body and to individual plan participants who file claims under the plan. Ms. Shaw's complaint pleads a very general claim for "ERISA violation." In construing pleadings, Courts are instructed to do so so as to do

substantial justice. Fed.R.Civ.P. 8(f). The complaint fails to use any specific nomenclature, but generally asserts that Defendant improperly denied Ms. Shaw's claim, and in so doing, breached its fiduciary duty to her as an individual. The Court sees no reason to dismiss Shaw's later reference to a claim for breach of fiduciary duty. Defendant is correct, however, that Plaintiff cannot assert a claim for monetary damages based on breach of a fiduciary duty. Plaintiff asks only for equitable relief as is permissible under the Act. Finally, Defendant's reliance on § 1113 as a statutory time-bar to Plaintiff's claim for breach of fiduciary duty is also misplaced. The limitation in § 1113 applies to claims of breach of the fiduciary duty as described in § 1101 et seq. Plaintiff's entire claim, whether termed a breach of fiduciary duty, an ERISA violation, or simply a suit to recover due benefits under her health benefits plan, is governed by the most analogous state statute of limitations, Iowa's ten-year breach of contract statute of limitations.[7]

## III. DENIAL OF SHAW'S PREAUTHORIZATION CLAIM UNDER ERISA

### A. Standard of Review

Although ERISA contains no standard of review, the Supreme Court has famously held that a reviewing court should apply a de novo standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan grants the Administrator discretionary authority, the Court reviews the administra-

---

7. The Court is not suggesting Plaintiff has pleaded two separate claims, only that a claim to recover improperly denied benefits is intertwined with the assertion that a plan administrator has breached its fiduciary duty to plan participants.

tor's decisions only for abuse of discretion. *Id.* at 115, 109 S.Ct. 948; *Donaho v. FMC Corp.*, 74 F.3d 894, 898. Here, the Plan grants McFarland, as Plan Administrator [8], sole discretion to "determine eligibility for Plan benefits, construe the terms of the Plan, determine all questions arising in the administration of the Plan..." Def.App. 8. Accordingly, this Court reviews McFarland's decision for abuse of discretion.

■ In determining whether the plan administrator abused its discretion, the proper inquiry is "whether the plan administrator's decision was reasonable; i.e. supported by substantial evidence." *Donaho,* 74 F.3d at 899. A plaintiff has two distinct lines of attack to show that a plan administrator abused its discretion in denying a claim: the administrator's interpretation of plan terms; and the administrator's review of facts to determine application of the plan. *See Farley v. Arkansas Blue Cross and Blue Shield,* 147 F.3d 774, 777 n. 6 (8th Cir.1998). In either case, the Court considers only the evidence before the plan administrator when the claim was denied.

■ Evaluating the reasonableness of the administrator's interpretation of the Plan terms requires the Court to analyze the interpretation under the five-factor test. *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir.1997); *Finley v. Special Agents Mut. Benefit Ass'n,* 957 F.2d 617 (8th Cir.1992). The five factors are: 1) whether the administrator's interpretation is consistent with the goals of the Plan; 2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; 3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether the administrator has interpreted the relevant terms consistent-

ly; and 5) whether the interpretation is contrary to the clear language of the Plan. *Id.* (citations omitted).

■ In determining whether the administrator's factual review and application of the plan was reasonable, the Court looks to whether the decision was supported by substantial evidence. *Farley,* 147 F.3d at 777. Substantial evidence is more than a scintilla, but less than a preponderance. *Sahulka v. Lucent Technologies, Inc.,* 206 F.3d 763, 767–68 (8th Cir.2000). Important in this review is that the Court will not substitute its judgment for that of the administrator. That is, the Court will not overturn an administrator's decision simply because the Court disagrees. *Donaho,* 74 F.3d at 899. Rather, the discretionary standard is whether a reasonable person, given the evidence presented in the administrative record, could have reached the same decision, not whether the reasonable person would have reached a like decision. *Cash,* 107 F.3d at 641.

**B. Notice and Full and Fair Reviews: ERISA's Procedural Requirements**

Fundamental to ERISA's regulatory framework is its procedural guidelines. Congress intended that ERISA provide the freedom and opportunity for plan participants and administrators to resolve disputes internally and without necessarily having to subject claim decisions to the expense and delay of the courts. *Weaver v. Phoenix Home Life Mutual Ins. Co.,* 990 F.2d 154, 157 (4th Cir.1993). To ensure the veracity of internal reviews, and to protect the rights of the individual plan participants, ERISA unconditionally mandates that every employee benefit plan shall:

**8.** As neither party addresses McFarland's apparent conflict of interest in both funding and administering the Plan, the Court need not

determine whether the conflict requires a relaxing of the standard of review.

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.

The Secretary of Labor has promulgated regulations setting out "certain minimum requirements" for claims procedures under employee benefit plans. 29 C.F.R. 2560.503–1(a)(1) (1984) (amended 2000, 2001). Under the regulations, "a claims procedure will be deemed to be reasonable only if it: (i) [c]omplies with the provisions of paragraphs (d) through (h) of this section..." 29 C.F.R. 2560.503–1(b)(1)(i) (1984) (amended 2000, 2001). Paragraph (f) provides:

A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. 2560.503–1(f) (1984) (amended 2000, 2001).

Paragraph (h) provides additional procedures for decisions on review after denial of the original claim. Notably, (h)(3) echoes paragraph (f) notice requirements for initial denials:

(3) The decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the claimant, as well as specific references to the pertinent plan provisions on which the decision is based.

29 C.F.R. 2560.503–1(h)(3) (1984) (amended 2000, 2001).

■ ERISA's claims procedure statute and regulations are "intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the [Plan Administrator] as a smoke screen to shield itself from legitimate claims." *Richardson v. Central States S.E. & S.W. Areas Pension Fund,* 645 F.2d 660, 665 (8th Cir.1981). As noted, the regulations provide minimum requirements for claims procedures, and specifically state that a plan's claims procedure is reasonable only if it complies with the minimum standards. Comparing the claims procedures employed under the Plan in this case with the statute and regulations fails to evidence even a modicum of reasonableness.

HAMP's first denial letter comes closest to satisfying the notice requirements, but is still woefully inadequate. The December 15, 1997 denial letter: fails to reference any specific plan provisions, stating only that the surgery would be considered cosmetic and not covered by the plan; offers a phone number for questions or to submit additional information, but fails to describe what materials might be necessary or why such information might be necessary; and fails to inform Shaw that

she has a right to review of her claim and how to go about seeking that review.

In response to Shaw's first appeal, HAMP first notified Plaintiff via telephone that her appeal had been denied because it was considered a cosmetic procedure. A written denial did not follow until two additional weeks had passed. The Court finds deeply troubling the fact that HAMP's February 25, 1998 letter offeres a completely different explanation for denying Shaw's claim than had the first letter or, more importantly, the phone denial she had received two weeks before. Far more distressing, however, is the fact that the February 25th letter purports to deny the claim because "this procedure is not a basic health care service." Def.App. 54. The phrase "basic health care service" appears no where within the Plan, much less within an exclusionary provision or within one of the various definitions of medically necessary. Thus, HAMP offers a nonexistent rationale for denying Plaintiff's appeal. It comes as no surprise that no specific plan provisions are referenced in support of the denial.

Shaw's appeal to Defendant McFarland, the plan's administrator, resulted in an utterly insulting written response, a courtesy copy of the letter McFarland sent HAMP affirming HAMP's claim denial. Needless to say, the letter contains no explanation of why the denial was affirmed, or what Shaw's rights might be. Such blatant procedural violations are untenable, and simply evince a complete lack of respect for Plaintiff and her claim under the Plan. Under the law of this circuit, a showing of a conflict of interest coupled with a finding of egregious procedural irregularities could be sufficient to strip a Plan Administrator of a deferential standard of review. See *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1030–31 (8th Cir.2000). As McFarland both funds and administers the Plan, an apparent conflict of interest exists. Plaintiff, however, has not raised these issues, and agrees with Defendant that an abuse of discretion standard is proper in this case. The Court will proceed accordingly.

The purpose behind ERISA's requirement that the plan administrator set forth the rationale underlying its decision is to allow the claimant to adequately prepare an appeal, and so that a federal court may properly review the decision. *Id.* "In order to properly apply the deferential standard of review, [the Court] must be provided the rationale underlying the [administrator's] discretionary decision." *Cox v. Mid–America Dairymen, Inc.*, 965 F.2d 569, 574 (8th Cir.1992). Here, Defendant's failure to comply with ERISA's procedural guidelines leaves this Court with little evidence of the rationale underlying its decision. Where the plan administrator fails to comply with ERISA's claims procedure statute and regulations, the normal course of action is to remand the case back to the administrator for a full and fair review. *Weaver*, 990 F.2d at 159. See *Cox*, 965 F.2d at 574. "No remand is necessary, however, where it would be a useless formality." *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 394 (7th Cir.1983).

Considering all the evidence in the case, the Court is unwilling to remand this case to the plan administrator. McFarland and HAMP's prior conduct leave this Court with serious misgivings about whether Shaw's claim can be reviewed impartially. Moreover, the Court believes the evidence clearly shows that McFarland abused its discretion as plan administrator both in interpreting terms under the plan, and in applying the evidence of Shaw's claim to the plan. See *infra.* Accordingly, remand is unnecessary.

## C. Plan Interpretation

██ Shaw alleges that McFarland via HAMP [9] abused its discretion in interpreting the plan term "cosmetic surgery" to deny her claim. To determine whether Defendant abused its discretion, the Court examines the administrator's interpretation under the five *Finley* factors listed above. Here, however, McFarland and HAMP provide little explanation for the denial of Shaw's claim. In such a case, the Court is advised to "seek a fuller explanation from the administrator and then apply the deferential standard of review." *Bernards v. United of Omaha Life Ins. Co.,* 987 F.2d 486, 488 (8th Cir.1993) citing *Cox,* 965 F.2d at 572. In the present case, however, the Court sees no need to procure further explanation from HAMP and McFarland. The Court "will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sand-bagged by after-the-fact plan interpretations devised for purposes of litigation." McFarland or HAMP denied Shaw's claim three times without providing an explanation. The opportunity to do so has certainly passed. Although slim, the record is sufficient to adduce certain facts that show McFarland abused its discretion in interpreting the plan's terms. The Court reviews these facts under the five *Finley* factors. First the facts.

1) The Plan defines "Cosmetic Surgery" as "surgery that is primarily for cosmetic purposes." This is a tautology and not a definition. By defining a term with its terms, the term means whatever the plan administrator decides it means.
2) The Plan provides that McFarland, as plan administrator with sole discretion to determine eligibility for plan benefits and to construe the terms of the Plan, "*shall make all such determinations and interpretations in a nondiscriminatory manner.*" Def.App. 8.
3) Under "what is covered", the plan states: "restorative plastic surgery to correct a functional defect which results from an acquired and/or congenital disease or injury is covered." Def.App. 22.
4) When Shaw submitted her claim, the Plan covered breast reconstruction surgery following a mastectomy. Def.App. 51.
5) Breast reconstruction following a mastectomy is not listed under the terms of the plan.
6) On Shaw's behalf, two of McFarland's practitioners, a medical doctor and a physician's assistant, wrote to HAMP asking HAMP to reconsider its denial because "I feel that [reconstructive tissue expander surgery] is a comparable situation, therefore there should be reimbursement." Def.App. 51.
7) In its denials of Shaw's claim and in the briefs and other papers it has filed in defense of this lawsuit, McFarland has never attempted to refute the equation of the two procedures. Rather, McFarland maintains that the Plan covers breast reconstruction surgery following a mastectomy pursuant to "The Woman's Health and Cancer Rights Act," 29 U.S.C. § 1185b, and that no comparable statute covers Shaw's claim. Defendant's Brief in Support of Motion for Summary Judgment, 5 n. 1; Defendant's Brief in Support of its Resistance to Plaintiff's Motion For Summary Judgment, 6 n. 1.
8) Shaw first requested preauthorization on September 24, 1997. McFarland denied Shaw's final appeal on May 21, 1998. The Woman's Health and Cancer

---

**9.** As McFarland retains sole discretionary authority under the Plan, it is certainly responsible for the actions of its agent HAMP.

Act, of which § 1185b is a part, was enacted as part of the Omnibus Appropriations bill on October 21, 1998, five months after McFarland denied Shaw's final appeal.

With these facts in mind, the Court applies the *Finley* factors. 1) Whether the administrator's interpretation is consistent with the goals of the plan. It is not. The purpose of the plan is to provide a broad range of healthcare coverage. Def.App. 9. As Plan Administrator with sole discretion to determine benefits, McFarland is charged with the duty to promote and enforce the goals of the plan in a "non-discriminatory manner." Def.App. 8. In the present case, Defendant's interpretation of the plan provides coverage for a procedure that is not listed under the terms of the plan, and that Defendant does not refute is comparable to Shaw's claim, which it denied repeatedly. In discriminating between the two claims, Defendant's interpretation runs afoul of the Plan's stated goals.

2) Whether the interpretation renders any language in the plan meaningless or internally inconsistent. The definition of cosmetic surgery is a useless tautology that renders meaningless the term it defines. As well, where two procedures are comparable and neither procedure is listed under the plan, an interpretation of a term that allows for one procedure and not for the other renders the term meaningless.

3) Whether the administrator's interpretation conflicts with the substantive or procedural requirements of ERISA. As Defendant's numerous procedural violations are detailed above, the Court sees no need to repeat them here, but the third *Finley* factor certainly weighs against McFarland.

4) Whether the administrator has interpreted the relevant terms consistently. As explained under the first two factors, Defendant did not interpret plan terms con-

sistently. A further inconsistency appears in Defendant's denials. Following its first denial of Plaintiff's claim, McFarland provided a different explanation for denying the same claim with no explanation for the inconsistency. This factor weighs in favor of finding an abuse of discretion.

5) Whether the interpretation is contrary to the clear language of the plan. The Plan states that McFarland will determine eligibility of benefits in a non-discriminatory manner. As shown above, it did not. The fifth factor weighs in favor of finding McFarland abused its discretion in interpreting the terms of the plan to deny Shaw's claim. Considering that all five factors weigh against McFarland, the Court has no difficulty finding that McFarland abused its discretion in interpreting the terms of the plan.

### D. Claim Review and Application of the Plan

In addition to abusing its discretion in interpreting the terms of the Plan, the Court finds that Defendant further abused its discretion by unreasonably denying Shaw's claim on less than substantial evidence. The record shows that HAMP initially denied Shaw's claim "based on review of [Dr. Montag's] letter." Def.App. 48. Defendant argues that HAMP was reasonable to limit its review to Dr. Montag's letter because Dr. Montag wrote "Ms. Shaw feels that her deformity is so obvious, that she does not feel comfortable wearing shorts or a skirt and is simply looking for a more symmetric appearance of her leg." One sentence taken out of context from a preauthorization request is not substantial evidence. Quite the opposite, HAMP denied Shaw's claim based on a scintilla of evidence. A nurse rather than a physician reviewed nothing beyond Montag's letter and summarily denied

Shaw's claim. Such an action is unreasonable, and is an abuse of discretion.

## IV. REMEDY.

The Court finds that McFarland abused its discretion both in interpreting and in applying the Plan to Shaw's claim. With such a finding, however, the question of whether Shaw's claim is covered under the plan remains unresolved. In reviewing claim denials under ERISA, this Court essentially sits as an appellate court. As such, it is not this Court's role to review Shaw's claim under the terms of the plan. That was the job of the Plan's Administrator. McFarland, however, abused its discretionary power, and the Court refuses to offer it another chance to deny Plaintiff's claim. McFarland owed Plaintiff an individual fiduciary duty to fairly and fully review her claim in a non-discriminatory way under the terms of the Plan. It has breached that duty and denied Plaintiff her rights under the Plan and under ERISA. ERISA provided Shaw with standing to bring this cause of action to enforce her rights under the Plan. Defendant has acknowledged that, although the Plan language makes no provision for the procedure, when Ms. Shaw first applied for preauthorization, the plan covered expenses for cosmetic breast reconstruction. Defendant's position that § 1185b requires payment for breast reconstruction but is irrelevant to Plaintiff's claim is indefensible as Shaw's claim had fully exhausted her administrative remedies five months before § 1185b was enacted. Defendant does not dispute the fact that this procedure is substantially similar to reconstructive plastic surgery to restore Plaintiff's polio stricken leg to a normal state. The Court's own investigation confirms this assertion. McFarland was wrong to deny Ms. Shaw's claim.

## V. CONCLUSION

Defendant's motion is denied. The Court grants Plaintiff's motion and enters summary judgment accordingly. Defendant is ordered to pay Plaintiff $10,979.00 plus interest since May 21, 1998 for the costs she has incurred as a result of Defendant's wrongful denial of her claim. Any request for costs or attorney's fees shall be filed pursuant to Fed.R.Civ.P. 54. L.R. 54 and 29 U.S.C. 1132.

IT IS SO ORDERED.