**John P. FURLEIGH, Plaintiff,**

**v.**

**ALLIED GROUP INC. and Continental Casualty Company, Defendants.**

**No. C02–3069–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

Sept. 8, 2003.

James M Stanton, Stanton & Sorensen, Clear Lake, IA, for Plaintiff.

Michael W. Thrall, John B. Tuffnell, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, PC, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................955
    A.  Procedural Background ................................................955
    B.  Findings of Fact .......................................................956
        1.  Allied's long term disability plan ...............................956
        2.  Plaintiff Furleigh's retirement ..................................957
        3.  Medical records ...................................................958

II.  LEGAL ANALYSIS ..............................................962
    A.  Standards For Summary Judgment......................................962
    B.  Timeliness of the Action ................................................963
        1.  Most analogous statute of limitations ............................963
            a.  Generally......................................................964
            b.  Where the applicable plan contains a contractual period of limitations ................................................964
                i.  Where the contractual period of limitations is expressly authorized by state statute...............................965
                ii.  Where the contractual limitations period in the plan is not expressly authorized by state statute .................967
        2.  Accrual of plaintiff Furleigh's cause of action .......................969
    C.  Timeliness Of Written Proof Of Loss .....................................972
    D.  Was Plaintiff Totally Disabled At The Time Of His Retirement? ..........974
        1.  Standard of Review ...............................................974
        2.  Total disability as defined by the Plan ............................974
        3.  Evidence of total disability .......................................975
            a.  Continuously unable to perform substantial and material duties of his occupation ....................................975
                i.  Incidents occurring during plaintiff Furleigh's employment ..........................................................976
                ii.  Medical records ........................................976
            b.  Under the regular care of a licensed physician ..................978
            c.  Not employed in any occupation ...............................978

III.  CONCLUSION ................................................979

## I. INTRODUCTION

### A. Procedural Background

On August 9, 2002, plaintiff John P. Furleigh ("Furleigh") filed a petition in the Iowa District Court for Cerro Gordo County against defendants Allied Group, Inc. ("Allied") and Continental Casualty Company ("CNA") to recover long term disabil-

ity ("LTD") benefits under Allied's long term disability plan ("Plan"), which was funded by a group term disability policy issued by CNA ("Policy"). Specifically, plaintiff Furleigh asserts Iowa common law claims for breach of contract and a declaratory judgment that Allied and CNA are in breach of contract. Defendants Allied and CNA removed the case to this court on September 10, 2002, pursuant to 28 U.S.C. § 1441, correctly asserting that Furleigh's claim was governed exclusively by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). (Doc. No. 1). On November 12, 2002, Defendants Allied and CNA filed their answer. (Doc. No. 5). Defendants Allied and CNA filed a motion for summary judgment on June 27, 2003, asserting that there is no genuine issue of any material fact that Furleigh's claim is barred as untimely under the terms of the Policy, and that plaintiff was not disabled at any time during his employment with Allied. (Doc. No. 15). Furleigh filed a timely resistance to defendants' motion for summary judgment on July 22, 2003 (Doc. No. 16). On July 23, 2003, this court granted the defendants' motion for extended time to reply to the plaintiff's resistance, and according to the terms of that order defendants Allied and CNA timely filed a reply on August 5, 2003 (Doc. No. 22). The court turns first to a discussion of the undisputed facts as shown by the record and the parties' submissions, then to consideration of whether the defendants are entitled to summary judgment.

1. Though the plaintiff's legal name is John P. Furleigh, he was also known as Jack Furleigh. *See* Defendants' Appendix in Support of Summary Judgment ("Defendants' Appendix"), Doc. No. 15 at 0034 (Retirement interview checklist listing the terminating employee as "Jack Furleigh (John P.)"); Defendants' Appendix, Doc. No. 15 at 0027 (Interoffice memo to "Jack Furleigh" regarding his retirement benefits).

## B. Findings of Fact

### 1. Allied's long term disability plan

Plaintiff John P. Furleigh[1] was employed by Allied Group, Inc. as a full-time claims supervisor from June 2, 1975 until July 7, 1995.[2] At the time of his retirement, Furleigh was sixty years old. As an employee of Allied, Furleigh participated in Allied's long term disability plan ("Plan"), an employee welfare benefit plan as defined by ERISA. This Plan was funded by a group term disability policy issued by CNA ("Policy"), which became effective on March 1, 1992. Defendants' Appendix in Support of Summary Judgment ("Defendants' Appendix"), Doc. No. 15 at 0087.[3] The Policy was effective through June 30, 1998. Furleigh was furnished with a copy of the summary plan description ("SPD") on September 12, 1992, which described, among other things, eligibility requirements for long term disability ("LTD") benefits under the Plan. Defendants' Appendix, Doc. No. 15 at 0026. The SPD's definition of "total disability" is as follows:

"Total Disability" means that, during the Elimination Period and Your Occupation Period, You, because of Injury or Sickness, are:

1. continuously unable to perform the substantial and material duties of Your regular occupation;

2. under the regular care of a licensed physician other than Yourself; and

2. Plaintiff Furleigh was born on December 24, 1934, and was 65 years of age on December 24, 1999. At the time he retired from Allied on July 7, 1995, Furleigh was 60 years old. Defendants' Appendix, Doc. No. 15 at 0034.

3. Much of the information cited by the court is contained within both parties' appendices. The court will cite only to the first properly paginated appendix.

3. not gainfully employed in any occupation for which You are or become qualified by education, training, or experience.

Defendants' Appendix, Doc. No. 15 at 0015. "Elimination Period" is defined further as "the length of time you must be disabled before you are eligible to begin receiving [benefits]." Defendants' Appendix, Doc. No. 15 at 0008. The SPD provides for an Elimination Period of 180 days, and an Occupation Period of 24 months. Defendants' Appendix, Doc. No. 15 at 0011. Under the terms of the SPD, benefits under the Plan terminate on the earliest of the following dates:

1. the date the policy is terminated;

2. the premium due date if ALLIED fails to pay the required premium for you, except for an inadvertent error; or

3. the date You

   a. are no longer a member of a class eligible for this insurance;

   b. withdraw from the program;

   c. are *retired* or pensioned; or

   d. cease work because of a leave of absence, furlough, layoff, or temporary work stoppage due to a labor dispute, unless We and ALLIED have agreed in writing to continue insurance during such period.

Termination will not affect a covered loss which began before the date of termination.

Defendants' Appendix, Doc. No. 15 at 0017 (emphasis added). The SPD also includes important provisions covering notice, proof of loss, and limitation on legal actions:

NOTICE OF CLAIM. Written notice of claim must be given to Continental Casualty Company within 30 days after the loss begins or as soon as reasonably possible.

The notice will suffice if it identifies You and the policy. ALLIED will send it to Continental Casualty Company ...

\* \* \* \* \* \*

WRITTEN PROOF OF LOSS. Written proof of loss must be furnished within 90 days after the end of a period for which we are liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless You are legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

\* \* \* \* \* \*

LEGAL ACTIONS. No action at law or in equity can be brought until after 60 days following the date proof of loss was given. No action can be brought after 3 years (Kansas 5 years, South Carolina 6 years) from the date written proof of loss is required.

Defendants' Appendix, Doc. No. 15 at 0018–0019.

### 2. *Plaintiff Furleigh's retirement*

Furleigh announced his retirement from Allied in a letter dated June 9, 1995, in which he declared July 7, 1995 as his last day of work. Prior to Furleigh's announcement, presumably in response to an inquiry by the plaintiff, an interoffice memorandum, dated October 8, 1994, was prepared by co-employee Nancy Hutchins describing the benefits Furleigh was entitled to upon his retirement from Allied. The following language regarding LTD benefits was contained in that memorandum: "Your long term disability coverage with the company ceases on the last day of your full time employment." Defendants' Appendix, Doc. No. 15 at 0027. Subsequent to announcing his retirement, another memorandum, dated June 13, 1995, discussing Furleigh's benefits upon retirement was generated. This memo-

randum contained the following language regarding LTD benefits: "Your long term disability coverage with the company ceases the last day of your full time employment." Defendants' Appendix, Doc. No. 15 at 0032. On June 16, 1995, Furleigh was subjected to a retirement interview in which various topics were discussed. A checklist memorializing the topics covered in this interview was generated, and the final document was signed by the plaintiff. On this checklist is a space for filling in the date that LTD benefits cease; the date filled into that blank is July 7, 1995, the date of plaintiff's retirement from Allied. Defendants' Appendix, Doc. No. 15 at 0034. The checklist does not mention that plaintiff Furleigh was suffering from any disability or ailment at the time the checklist was created.

### 3. Medical records

On May 27, 1994, Furleigh saw his family physician, Dr. W.K. Dankle, of Mercy Family Care Clinic in Clear Lake, Iowa, to address concerns regarding his "gradually declining neurologic status." Defendants' Appendix, Doc. No. 15 at 0098. The record of that visit notes that the plaintiff was complaining of the following symptoms:

1. Difficulty with right eye-hand coordination.

2. Occasional speech difficulty (trouble pronouncing n's and s's).

3. Deterioration of hand writing.

4. Difficulty walking a straight line.

5. Right hand tremor.

Defendants' Appendix, Doc. No. 15 at 0098. During that visit, Dr. Dankle observed that plaintiff Furleigh's coordination was diminished, and that he had some difficulty walking. Though Dr. Dankle could not pinpoint the cause of plaintiff's symptoms, he did recommend that plaintiff Furleigh arrange a consultation with a neurologist. Dr. Dankle did not diagnose plaintiff Furleigh with any specific disorder at this time.[4]

Following this visit, Furleigh was seen by neurologist, K.G. Woodward at the Mason City Clinic, where he was diagnosed with "alcoholic cerebellar degeneration."[5]

On December 12, 1995, Furleigh again visited Dr. Dankle. This visit was sparked by the worsening of plaintiff's condition; specifically, that his gait was becoming increasingly unsteady, and he had increased difficulty speaking and writing. Dr. Dankle concluded that the symptoms where a result of "Ataxia, felt to be due to cerebellar degeneration." Defendants' Appendix, Doc. No. 15 at 0097. As a result of this visit Dr. Dankle made arrangements for plaintiff Furleigh to be evaluated at the Mayo Clinic.

In January 1996, Furleigh was seen at the Mayo Clinic Department of Neurology. At this time, plaintiff exhibited "clear cut symptoms and signs" of a spinocerebellar disorder,[6] and was again diagnosed with

---

4. Records of a subsequent visit to Dr. Dankle on May 20, 1996 note: "We did a comprehensive exam two years ago and noted an ataxia." Defendants' Appendix, Doc. No. 15 at 0097. Also, records of a November 7, 2000, visit to Dr. Dankle state that "signs and symptoms of ataxia [were noted] on [sic] a May 1994 examination." Defendants' Appendix, Doc. No. 15 at 0094. "Ataxia" is defined as "[a]n inability to coordinate muscle activity during voluntary movement; most often due to disorders of the cerebellum or the posterior columns of the spinal cord; may involve limbs, head, or trunk." STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

5. The record of Furleigh's visit to Dr. Woodward was not provided to this court, therefore making it impossible to place an exact date on when the diagnosis was made. However, this visit is referred to in notes from Furleigh's December 12, 1995 visit to Dr. Dankle, and therefore it must have taken place between May 27, 1994 and December 12, 1995.

6. "Spinocerebellar ataxia" (aka spinocerebellar disorder) is defined as "the most common hereditary [ataxia]." STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

alcoholic cerebellar degeneration. Defendants' Appendix, Doc. No. 15 at 0091 & 0097. At that time Furleigh was advised to abstain from all alcohol and take vitamins with thiamine.

On May 20, 1996, Furleigh returned to Dr. Dankle for a comprehensive exam. Upon a neurological examination, Dr. Dankle noted: "Cranial nerves are grossly intact. DTR's are inactive and equal. There is no resting tremor. No gross motor nor sensory defects. Gait is still mildly ataxic." Defendants' Appendix, Doc. No. 15 at 0097.

Plaintiff Furleigh was seen on August 19, 1997, and September 12, 1997, by Dr J. Eric Ahlskog, a neurologist at the Mayo Clinic in Rochester, Minnesota. Plaintiff's neurological exam on August 19, 1997, "showed definite and widespread neurologic motor deficits including cerebellar and parkinsonism with the cerebellar being more predominant." Defendants' Appendix, Doc. No. 15 at 0091. Dr. Ahlskog noted that while the plaintiff was not mentally incapacitated, he did suffer from "substantial neurologic impairment[s], ... [that] would have compromised many activities and certainly would have compromised his employability and his ability to function effectively in the workplace." Defendants' Appendix, Doc. No. 15 at 0091. Dr. Ahlskog also recognized that the disorder was progressive and would not improve over time, and that there were no medications available at the time plaintiff Furleigh was examined that would have provided substantial relief from the symptoms.

Records from a visit to Dr. Dankle on January 1, 1998, note that Furleigh's "ataxia has progressed being followed at Mayo Clinic, now with diagnosis probable late unset [sic] hereditary ataxia." [7] Defendants' Appendix, Doc. No. 15 at 0096.

On March 6, 1998, plaintiff Furleigh was seen by Dr. Robert Borgman, of Mercy Family Care in Clear Lake, Iowa, for an injury to plaintiff's right thumb that was sustained while plaintiff was operating a table saw.

In an August 3, 1998, visit, Dr. Dankle noted that: "Patient has mild dysarthria [8] and uses a tall pole for balance assistance and ambulation." Defendants' Appendix, Doc. No. 15 at 0095.

Furleigh again visited Dr. Dankle on November 7, 2000, to follow up problems accompanying his ataxia. Records note that the Furleigh's balance was steadily worsening, and that he now "use[d] a walker in the house and a walking stick outside." Defendants' Appendix, Doc. No. 15 at 0094. Dr. Dankle noted the diagnosis as "cerebellar ataxia, late onset hereditary with possible effects due to chronic alcohol intake" and ordered medical tests. Defendants' Appendix, Doc. No. 15 at 0094.

On November 27, 2000, Furleigh returned to Dr. Dankle's office in order to follow up on the test results. In the record for this visit, Dr Dankle notes that the plaintiff reported "that he had seen Dr. Hayreh a year ago for a social security disability examination." Defendants' Appendix, Doc. No. 15 at 0093. After reviewing the test results, plaintiff elected to

---

**7.** "Hereditary cerebellar ataxia" is defined as:

(1) a disease of later childhood and early adult life, marked by ataxic gait, hesitating and explosive speech, nystagmus, and sometimes optic neuritis. It probably comprises several distinct conditions with diverse patterns of inheritance. (2) collective term for a number of hereditary disorders in which cerebellar signs are the most prominent finding.
STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

**8.** "Dysarthria," is defined as a "disturbance of the speech due to emotional stress, to brain injury, or to paralysis, incoordination, or spasticity of the muscles used for speaking."
STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

proceed with a physical therapy evaluation by a Mills Lake therapist. At this time, Dr. Dankle wrote Furleigh a prescription for a medication to help improve his balance.

On September 28, 2001, Furleigh again returned to Dr. Dankle to follow up on his ataxia. At this time, Furleigh reported increased progression of the disease in that he had not been able to drive for the last six months, and that he was attempting to get an electric wheelchair to assist his movement. Dr. Dankle's notes observe that the plaintiff's speech was slurred, and that the ataxia has worsened to the point that the plaintiff required a walker. Dr. Dankle also notes that "there is no treatment for this condition." Defendants' Appendix, Doc. No. 15 at 0092.

Subsequent visits to Dr. Dankle for other ailments on November 16, 2001, November 30, 2001, and January 17, 2002, note that Furleigh's cerebellar ataxia remained unchanged since the September 28, 2001 visit.

In records of a March 11, 2002, visit, Dr. Dankle notes that Furleigh's "speech is somewhat more dysarthric [9] than previous visit. Using wheel walker for ambulation." Defendants' Appendix, Doc. No. 15 at 0104.

Records of a April 22, 2002 visit to Dr. Dankle noted that Furleigh's ataxia was worsening and that, after falling, he was now unable to get up on his own. At this time, Dr. Dankle observed that plaintiff has "increased dysarthria and less easily understood." Defendants' Appendix, Doc. No. 15 at 0102.

### 4. *Furleigh's disability claims.*

On September 15, 1999, Furleigh contacted Ms. Angelique Koppen, an Employ-ment Manager with Allied's Human Resources Department, and stated that he wanted to file a LTD claim as he had been diagnosed with ataxia.

On October 9, 1999, in response to that telephone call, Ms. Jill Wedemeyer, an Executive Secretary in Allied's Human Resources Department, mailed Furleigh a response letter together with a copy of the SPD in effect at the time plaintiff retired from Allied in 1995. The letter stated that "[a]lthough time has expired to file a claim, you may contact CNA at their new address," and then proceeds to list CNA's new contact information. Defendants' Appendix, Doc. No. 15 at 0035.

On October 16, 1999, Furleigh wrote a letter directed to Ms. Wedemeyer, but *addressed* to CNA at its new address as given in the October 9, 1999 correspondence. In this letter Furleigh requested that CNA and/or Allied "waive any time period to make a claim as designated in the policy," and stated that he wished to make a claim regardless of the time limit contained in the policy. Defendants' Appendix, Doc. No. 15 at 0036.

On April 23, 2001, Furleigh wrote a letter to Marla Franklin, Vice President of the Human Resources Department at Allied, which: (1) detailed the incidents the plaintiff felt evidenced his disease during his employment at Allied: (2) set forth his medical diagnosis; and (3) stated that he had not heard from anyone regarding his request to make a claim.

On May 3, 2001, Kathy Myer, an Executive Secretary with Allied's Human Resources Department, responded to Furleigh's April 23, 2001 correspondence. Enclosed with the response letter was a LTD claim form from CNA that was par-

---

**9.** "Dysarthic" is defined as "relating to dysarthria." STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

tially filled in by Ms. Myer. Under the 'nature of disability category' on the claims form Ms. Myer wrote: "no disability known at time of employee's retirement." In a blank asking whether the employee was eligible for LTD benefits, Ms. Myer wrote "NO." Defendants' Appendix, Doc. No. 15 at 0039. Further, the letter gave the following instructions:

> Although time has expired to file a claim, in order for CNA to consider a claim, they will need a claim form with your signature and completed by your physician.

Defendants' Appendix, Doc. No. 15 at 0038.

In a letter dated June 11, 2001,[10] Mr. James Stanton, representing Furleigh, wrote CNA. This letter stated that plaintiff Furleigh retired on July 7, 1995 with the "totally disabling condition of Ataxia." Defendants' Appendix, Doc. No. 15 at 0075. Further, the letter stated that Furleigh had written Allied a letter describing his condition *prior to* his retirement, and that plaintiff had discussed his medical condition with his supervisor, Randy Eggers, on several occasions. The letter concludes by requesting that CNA provide Mr. Stanton with a standard claim form.

On July 2, 2001, CNA received a "Disability form" from Mayo Medical center. This form was provided to "use in processing a disability claim." Defendants' Appendix, Doc. No. 15 at 0077. The form listed plaintiff Furleigh as the patient, described the dates he was seen at the clinic as "August 28 through September 12, 1997," and gave the diagnosis as "Cerebellar ataxia; Parkinsonism; ataxia." Defendants' Appendix, Doc. No. 15 at 0077. The following statement was placed under a category entitled 'Disability Information': "On June 20, 2001, Dr. J.E. Ahlskog stated Mr. Furleigh should be considered perma-

nently totally disabled since July 8, 1995." Defendants' Appendix, Doc. No. 15 at 0077.

On July 15, 2001, CNA received the LTD claim form that was sent to Furleigh as an enclosure to Ms. Myer's May 3, 2001 letter. The form was signed by plaintiff Furleigh, but was not dated. On this form, the plaintiff claimed that his disability started in 1990.

On July 24, 2001, CNA Disability Specialist Catherine Mayne sent a response to Mr. Stanton's June 11, 2001 letter. Ms. Mayne indicated that the requested claim forms were enclosed, and that Furleigh's employer and attending physician needed to complete the required forms and send them to the address given in order for the claim to be considered.

On August 27, 2001, Ms. Mayne sent a letter to Mr. Stanton informing him that no claim forms had been received, and that if they were not received by September 18, 2001, the file would be closed.

On September 27, 2001, Ms. Mayne sent another letter to Mr. Stanton informing him that none of the documents necessary to process the claim had been received, and that, therefore, the claim was closed for noncompliance. Ms. Mayne further advised that the claim would be reopened upon the receipt of the claim forms.

On June 14, 2002, Mr. Stanton sent a letter to Ms. Mayne requesting the file be reopened. Defendants' Appendix, Doc. No. 15 at 0081. Furleigh's 'completed' claim forms were enclosed with that correspondence. On the claims form, Furleigh listed the start of his disability as July 1, 1990. The required physician's and employer's statements enclosed were erroneously filled out and signed by plaintiff Furleigh, rather than his physician and employer, respectively.

---

**10.** Though the letter is dated June 11, 2001, it was not 'stamped' as received by CNA until July 5, 2001. Defendants' Appendix, Doc. No. 15 at 0075.

On June 24, 2002, CNA Disability Specialist Jennifer Greene responded to Mr. Stanton's June 14, 2002, letter. In this correspondence, Ms. Greene informed Mr. Stanton that Furleigh was not eligible for disability benefits from CNA because his disability began before the effective date of the policy. The letter further points out that the claim forms submitted to CNA were not valid because they were all, erroneously, signed by Furleigh.

Mr. Stanton again wrote CNA on July 1, 2002, requesting an answer to the following question: "Is not Continental's policy a 'Claims Made' policy as opposed to a policy that relates disability coverage to dates of employment?" Defendants' Appendix, Doc. No. 15 at 0088.

In a letter dated July 9, 2002, Ms. Greene gave the following response to Mr. Stanton's inquiry:

> CNA held the above policy for your client's employer Allied Mutual, with effective dates of 3/1/92 through 6/30/98. This policy only covers losses that occur within the effective dates of the policy. Since Mr. Furleigh's disability began on 7/1/90 he was not covered under our policy.

Defendants' Appendix, Doc. No. 15 at 0089.

A bench trial on this matter is presently scheduled for November 17, 2003. Plaintiff Furleigh is represented by James M. Stanton of Stanton & Sorensen Law Firm, in Clear Lake, Iowa. Defendants Allied and CNA are represented by Michael Thrall of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. This matter is now submitted for determination on the merits.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir. 2000) (Table op.); *Sec. State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Cmty. Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,*

*and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)–(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which the party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all facts in the light most favorable to the nonmoving party and give the party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348,

89 L.Ed.2d 538; *Quick,* 90 F.3d at 1377; *Marshall v. UNUM Life Ins. Co.,* 13 F.3d 282, 283 (8th Cir.1994). With these standards in mind, the court turns to consideration of the defendants' motion for summary judgment.

**B. Timeliness of the Action**

**1. Most analogous statute of limitations**

■■■ ERISA contains no statute of limitations for actions to recover plan benefits. *Mead v. Intermec Technologies Corp.,* 271 F.3d 715, 717 (8th Cir.2001); *Cavegn v. Twin City Pipe Trades Pension Plan,* 223 F.3d 827, 829 (8th Cir.2000); *Duchek v. Blue Cross and Blue Shield of Nebraska,* 153 F.3d 648, 649 (8th Cir.1998); *Blaske v. UNUM Life Ins. Co. of Am.,* 131 F.3d 763, 764 (8th Cir.1997); *Adamson v. Armco, Inc.,* 44 F.3d 650, 652 (8th Cir.), *cert. denied,* 516 U.S. 823, 116 S.Ct. 85, 133 L.Ed.2d 42 (1995); *Shaw v. The McFarland Clinic, P.C.,* 231 F.Supp.2d 924, 932 (S.D.Iowa 2002). Therefore, the court must "characterize the essence of the claim in the pending case, and decide which state statute provides the most appropriate limiting principle." *Shaw,* 231 F.Supp.2d at 932 (citing *Robbins v. Iowa Rd. Builders Co.,* 828 F.2d 1348, 1353 (8th Cir.1987)) (quoting *Wilson v. Garcia,* 471 U.S. 261, 268, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). In other words, the court will "borrow" from the state in which it sits, the statute of limitations that is most analogous to the claim. *Duchek,* 153 F.3d at 649; *see Johnson v. State Mut. Life Assurance Co. of Am.,* 942 F.2d 1260, 1262–63 (8th Cir.1991) (en banc); *Adamson,* 44 F.3d at 654 ("In absence of a conflict with federal policy, 'suits to recover ERISA benefits should be governed by the norm, the most analogous state statute of limitations.'") (quoting *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)). The Eighth Circuit Court of Appeals has deter-

mined that a claim for ERISA benefits is "characterized as a contract action for statute of limitations purposes." *Bennett v. Federated Mut. Ins. Co.*, 141 F.3d 837, 838 (8th Cir.1998) (quoting *Adamson*, 44 F.3d at 652).

### a. Generally

■ Where the applicable plan does not contain a contractual limitations period, or where a contractual period of limitations contained in the plan is held invalid or unreasonable, the court will generally apply the state statute of limitations period for actions based on written contracts to ERISA claims for benefits. *See, e.g., Bennett*, 141 F.3d at 838 (applying Arkansas five year statute of limitations to claim to recover pension benefits under ERISA); *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir.), *cert. denied*, 525 U.S. 817, 119 S.Ct. 56, 142 L.Ed.2d 43 (1998) (finding Nebraska's five year statute of limitations for actions on written contracts most analogous); *Miles v. New York State Teamsters Conference Pension and Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir.1983) (using New York's six year statute of limitations for suits based on contractual obligations to determine if claim for benefits was timely); *Shaw*, 231 F.Supp.2d at 934 (applying Iowa's ten year statute of limitations for actions based on a written contract); *Bolduc v. Nat'l Semiconductor Corp.*, 35 F.Supp.2d 106, 118 (D.Me.1998) (determining Maine six year statute of limitations for civil actions applicable to action seeking to recover plan benefits); *S. Elec. Ret. Fund v. George Arp Elec. Corp.*, 635 F.Supp. 139, 144 (E.D.Tenn.1986) (applying Tennessee six year statute of limitations to suit under ERISA for wrongful denial of pension benefits); *Ferguson v. Greyhound Ret.and Disability Trust*, 613 F.Supp. 323, 324 (W.D.Pa.1985) (determining Pennsylvania's statute of limitations for contract actions most analogous to claims seeking recovery of disability benefits from disability trust); *but see Mead*, 271 F.3d at 717 (holding that claim for short-term disability benefits fell under the Iowa Wage Payment Collection Act, and therefore was subject to a two year statute of limitations under IOWA CODE § 614.1(8)); *Cavegn*, 223 F.3d at 830 (finding Minnesota two year statute of limitations for recovery of wages, overtime or damages accruing under federal law applicable to claim for disability benefits). The general Iowa statute of limitations for causes of action based on written contracts is ten years. IOWA CODE § 614.1(5) (2003).

### b. Where the applicable plan contains a contractual period of limitations

It is undisputed that the Plan contains the following contractual period of limitations on plaintiff Furleigh's ability to bring legal actions:

> LEGAL ACTIONS. No action at law or in equity can be brought until after 60 days following the date proof of loss was given. No action can be brought after 3 years (Kansas 5 years, South Carolina 6 years) [11] from the date written proof of loss is required.

Defendants' Appendix, Doc. No. 15 at 0019.

---

11. It appears that the language for differing periods of limitation for Kansas and South Carolina was an attempt by CNA and Allied to conform the Plan to the law of those states, and further gain the benefit of having the contractual limitations period expressly authorized by state statute. *See* KAN. STAT. ANN. § 40–2203(A)(11) (2003) (requiring the following provision in accident and health insurance policies: "Legal Actions": ... No such action shall be brought after the expiration of *five* years after the time written proof of loss is required to be furnished) (emphasis added); S.C. CODE ANN. § 38–71–735(m) (2003) (requiring group accident and health insurance plans to contain a provision that "no action at

***i. Where the contractual period of limitations is expressly authorized by state statute.*** Unlike the general analysis above, where the applicable plan provides its own limitations period, as it does in this case, the determination of the most 'analogous' limitations period becomes more complex. Furleigh argues that the contractual period of limitation is inherently unreasonable, and that the general Iowa statute of limitations for contract actions, ten years, should apply. Defendants Allied and CNA vigorously assert that IOWA CODE § 514A.3(1)(k), a provision in the insurance portion of the Iowa code requiring particular language in accident and health insurance policies, is the most analogous statute of limitations to the cause of action:

> **Legal actions:** No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

IOWA CODE § 514.3(1)(k) (2003). Further, Defendants rationalize that in light of section 514.3(1)(k), the three year contractual limitations period found in the Plan is expressly authorized and enforceable under the reasoning of *Duchek v. Blue Cross and Blue Shield of Nebraska,* 153 F.3d 648 (8th Cir.1998). In *Duchek,* the Eighth Circuit Court of Appeals had to determine the statute of limitations most analogous to an action to recover medical expenses under an employee welfare benefit plan. *Id.* at 649. The employee welfare benefit plan in question had a provision requiring an action challenging the denial of a claim be filed within three years from the date that written proof of loss was required. *Id.* The Eighth Circuit first determined that the plan was a group health and accident insurance policy governed by the 'Insurance' chapter of the Nebraska Statutes. *Id.* Then the court focused its attention on the statutory requirement that all group health and accident insurance policies contain a provision prohibiting legal action "'after the expiration of three years after the time written proof of loss is required to be furnished.'" *Id.* at 650 (quoting NEB. REV. ST. § 44–710.03(11)). The Eighth Circuit held that this statutory provision was the most analogous statute of limitations under ERISA, and that the three year statute of limitations found in the plan was controlling as it was expressly authorized by statute. *Id.* Under this analysis, in appears to this court that two benefits stem from a contractual limitations period authorized by state statute: (1) the state statute authorizing the contractual limitations period is the most analogous statute of limitations for ERISA purposes; and (2) the contractual limitations period is accorded a presumption of reasonableness.

■ Whether IOWA CODE § 514A.3(1)(k) is the most analogous statute of limitations to a claim for ERISA benefits under this, or any other group accident and health insurance policy, is a matter of first impression. Following the logic of *Duchek,*[12]

---

law or in equity may be brought ... at all unless within *six* years after the time written proof of loss is required to be furnished.") (emphasis added).

**12.** The categorizing of statutory provisions requiring insertion of a mandatory contractual limitation period as statute of limitations for purposes of selecting the most analogous stat-

ute of limitations under an ERISA analysis, as in *Duchek,* closely mimics the analysis employed by the majority of circuits. *See, e.g., LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 509 (1st Cir.1998) (characterizing 24-A M.R.S.A. § 2715 as a statute of limitations in determining that there was no equitable basis to halt the running of the limitations period); *Hofkin v. Provident Life & Acc. Ins. Co.,* 81

the first step in determining if section 514A.1(3)(k) is the most analogous state statute of limitations is to ascertain whether the Plan in question falls under the definition of plans covered under Iowa Code Chapter 514A. Section 514A.1 provides the pertinent definition:

> "Policy of accident and sickness insurance" as used in this chapter includes a policy or contract covering insurance against loss resulting from sickness, or from bodily injury or death by accident, or both....

Iowa Code § 514A.1 (2003). The Plan in question in this case comfortably fits under this definition. Were this the end of the inquiry, the reasoning of *Duchek* would unquestionably control, and section 514A.3(1)(k) would be the most analogous state statute of limitations. However, there is a fatal flaw in the analysis that neither party has addressed. Under Iowa Code § 514A.8, "[n]othing in this chapter shall apply to or affect ... (3) any blanket or *group* policy of insurance ..." Iowa Code § 514A.8(3) (2003) (emphasis added).[13] A complete reading of section 514A.1 reveals this language: "[t]his chapter applies to all *individual* policies of such accident and sickness insurance."

---

F.3d 365, 370 (3rd Cir.1996) (describing 40 Pa. Stat. Ann § 753(A)(11) as a statute of limitations); *Swartz v. Berkshire Life Ins. Co.*, No. 99 Civ. 9462, 2000 WL 1448627, at *7 (S.D.N.Y. Sept. 28, 2000) (comparing N.Y. Ins. Law § 3216(d)(1)(K) to other statutes of limitations); *Simon v. Allstate Employee Group Med. Plan*, No. 99 C 5212, 2000 WL 1011596, at *2 (N.D.Ill. July 18, 2000) (describing 215 Ill. Comp. Stat. § 5/357.12 as a statute of limitations); *I.V. Services of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 7 F.Supp.2d 79, 86 (D.Mass.1998) (describing Mass. Gen. Laws. ch. 175, § 108(3)(a)(11) as a three year statute of limitations). However, a recent line of cases stemming from the Ninth Circuit decision in *Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643 (9th Cir.2000), have refused to recognize mandatory, statutory contractual limitation provisions as 'statutes of limitations' for purposes of determining the most analogous state statute of limitations provision under ERISA. *See Flynn v. Paul Revere Ins. Group*, 2 Fed. Appx. 885, 886, No. 98–16733, 2001 WL 80408 at *1 (9th Cir. Jan. 30, 2001) (following the reasoning of *Wetzel* that the statutorily required contractual limitations period is not a statute of limitations, but rather a "contractual limitations period which operates distinct and apart from the statutory limitations period set by the state legislature") (citation omitted); *Wetzel*, 222 F.3d at 648 (holding that although statutorily required contractual limitations period performs the function of a statute of limitations, it is not a statute of limitations, and that the California statute of limitations for written contracts is the most applicable statute of limitations for an ERISA cause of action based on a claim for benefits under a written contractual policy); *Rodolff v. Provident Life and Accident Ins. Co.*, No. 01–CV–0768H(AJB), 2002 WL 32072401 (S.D.Cal. Apr. 5, 2002) (following the *Wetzel* rational, and determining whether the plaintiff's claims were time barred solely by looking at the general contract statute of limitations and the reasonableness of the contractual language in the policy). The court recognizes this line of cases, but rejects the analysis employed by *Wetzl*, and refuses to follow its reasoning as it is antagonistic of the federal policy established by *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 464, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975): "In borrowing a state period of limitation for application to a federal cause of action, a federal court is relying on the [s]tate's wisdom in setting a limit, and exceptions thereto, on a closely analogous claim." A mandate by the legislature of a state that a contractual limitations period be included in a particular insurance contract is tantamount to a statute of limitations, and should be treated as such. Ignoring these state statutory mandates in determining the most analogous statute of limitations eviscerates the federal policy of relying on the state's wisdom in setting a limit on analogous claims. *See Johnson*, 421 U.S. at 464, 95 S.Ct. 1716.

**13.** It is worthwhile to note that Iowa Code § 514A.8 has not been amended since 1976, and therefore its wording today is the same as it was at the time the Plan in question was effective.

IOWA CODE § 514A.1 (emphasis added). The Plan provided by the Defendants in this matter is entitled *"Group* Long Term Disability Insurance," and therefore chapter 514A expressly does *not* apply to the Plan. Defendants' App., Doc. No. 15 at 0006 (emphasis added). Accordingly, section 514A.3(1)(k) is not the most analogous statute of limitations to an ERISA cause of action based on a group accident and health policy.

Chapter 509 of the Iowa Code is the chapter applicable to *group* accident and health insurance. *See* IOWA CODE § 509.1 (2003). Further, section 509.3, which lists the provisions that must be included in group accident and health insurance policies issued in Iowa, does not require any specific contractual limitations clause. *See* IOWA CODE § 509.3 (2003). As the three year limitations period in the plan is not expressly authorized by an Iowa statutory provision, the *Duchek* analysis is inapplicable to this case.

**■ ii. Where the contractual limitations period in the plan is not expressly authorized by state statute.** Courts have traditionally held that:

> [I]n the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than prescribed in the general statute of limitations, provided that the shorter period itself shall be reasonable.

*Order of United Commercial Travelers v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947). This general contract rule has been applied to ERISA actions by several courts, including the Eighth Circuit. *See, e.g., Wilkins v. Hartford Life and Accident Ins. Co.,* 299 F.3d 945, 948 (8th Cir.2002) (holding the Plan's contractual limitations period enforceable in light of state case law allowing parties to contract for a limitation period shorter than that prescribed by the applicable statute of limitations); *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan,* 160 F.3d 1301 (11th Cir.1998) (holding that contract limitations in ERISA plans are enforceable provided they are reasonable, and finding 90–day limitation period reasonable and enforceable); *Doe v. Blue Cross and Blue Shield United of Wis.,* 112 F.3d 869 (7th Cir.1997) (upholding plan's three-year limitations period instead of state's six year breach of contract period); *Alcorn v. Raytheon Co.,* 175 F.Supp.2d 117 (D.Mass.2001) (holding contractual limitation period of three years reasonable and enforceable); *Allen v. Unionmutual Stock Life Ins. Co.,* 989 F.Supp. 961, 965 (S.D.Ohio 1997) ("reasonable contractual limitations of a party's right to bring suit are enforceable and supersede the statute of limitations under state law"); *Bomis v. Metro. Life Ins. Co.,* 970 F.Supp. 584, 588 (E.D.Mich.1997) (upholding a three-year limitation period specified in an employee benefit plan as reasonable). Under the same general principle, Iowa law supports contractual limitations provisions in insurance contracts that differ from the general state statute of limitations that would otherwise apply. *Nicodemus v. Milwaukee Mut. Ins. Co.,* 612 N.W.2d 785, 787 (Iowa 2000) (recognizing the rule that a contractual limitations provision is enforceable if reasonable and applying it to an insurance policy); *Douglass v. Am. Family Mut. Ins. Co.,* 508 N.W.2d 665, 667 (Iowa 1993) ("Iowa has long recognized the rights of insurers to limit time for claims, irrespective of a legislative imprimatur on such provisions .... it is clear that the authority to reduce claims time springs from general contract principles, not from any statutory grant of authority.") (citations omitted), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.,* 612 N.W.2d 775 (Iowa 2000).

■ Therefore, in this case, the Plan's contractual limitations policy will be enforceable, and recognized as the most appropriate limitations period to apply in this matter, if it is reasonable.[14] Predictably, on this point defendants Allied and CNA assert that the limitations period is reasonable based on other court holdings finding the length of similar limitations periods reasonable, while plaintiff Furleigh declares the limitations period unreasonable because its language and context make it impossible for a claimant to understand. Under Iowa law, the reasonableness of a contractual limitations period is determined "in light of the provisions of the contract and the circumstances of its performance and enforcement." *Nicodemus,* 612 N.W.2d at 787 (quoting *Douglass,* 508 N.W.2d at 666). Further, a limitations provision that requires the plaintiff to bring an action before any loss can be ascertained is per se unreasonable. *Id.* (quoting *Douglass,* 508 N.W.2d at 666). Under a reasonableness analysis, many courts, including the Eighth Circuit Court of Appeals, have held similar contractual limitation periods reasonable. *Wilkins,* 299 F.3d at 948 (finding by the Eighth Circuit that a three-year contractual limitations period to bring suit for ERISA benefits reasonable, and applicable); *Northlake,* 160 F.3d at 1304 (holding by the Eleventh Circuit that the Plan's 90-day limitations period for ERISA benefits action enforceable); *Blaske,* 131 F.3d at 764 (holding by the Eighth Circuit Court of Appeals that a three year contractual statute of limitations is reasonable, while noting that it was more liberal than the general two-year statute of limitations that would otherwise apply); *Doe,* 112 F.3d at 875 ("There is no doubt that the contractual limitation here–39 months from the date of the services for which benefits are sought–is reasonable in general and in this case."); *Sousa* ex rel. *Sousa v. Unilab Corp. Class II (Non–Exempt) Members Group Benefit Plan,* 252 F.Supp.2d 1046, 1057 (E.D.Cal.2002) (concluding that the plan's contractual three-year limitation period is reasonable, and therefore applies); *Alcorn,* 175 F.Supp.2d at 122 ("the Plan's three-year limitation is reasonable and it governs plaintiff's claim for benefits"); *Hembree* ex rel. *Hembree v. Provident Life and Accident Ins. Co.,* 127 F.Supp.2d 1265, 1269 (N.D.Ga.2000) (determining three-year contractual limitations period reasonable); *Moore v. Berg Enterprises, Inc.,* 3 F.Supp.2d 1245, 1247–48 (D.Utah 1998) (applying contractual three year limitation period after finding it reasonable); *Chilcote v. Blue Cross & Blue Shield United of Wis.,* 841 F.Supp. 877, 880 (E.D.Wis. 1993) (finding a three year contractual limitations period for a benefits action under ERISA clearly reasonable); *but see Hansen v. Aetna Health and Life Ins. Co.,* No. CIV. 98–949–HA, 1999 WL 1074078, at *4 (D.Or. Nov. 4, 1999) (holding contractual two-year limitations period unreasonable where the entire time was taken up by mandatory administrative appeals process). Likewise, in this case, the court finds the Plan's three-year contractual limitations period reasonable, and enforceable.

In this respect plaintiff Furleigh argues that the contractual limitations period is unreasonable because it is "difficult, if not

---

14. Some courts have even determined that choosing the state statute of limitations to borrow is unnecessary where the parties have contractually agreed upon a limitations period. *See Northlake,* 160 F.3d at 1303 ("Choosing which state statute of limitations to borrow is unnecessary, however, where the parties have contractually agreed upon a limitations period."); *Alcorn,* 175 F.Supp.2d at 122 (failing to select the most analogous state statute of limitations, and rather focusing solely on the reasonableness of a contractual limitations clause contained in the policy).

impossible, for a claimant of ordinary facilities" to determine when proof of loss is required, and therefore equally untenable for a claimant to determine when the contractual limitations period for legal actions commences. Plaintiff's Resistance to Motion for Summary Judgment, Doc. No. 17, ¶ 7. While the court sympathizes with the fact that modern insurance policies are complex and fraught with terms of art, this alone does not make the policy, or the contractual limitations period, unreasonable. "[E]ven individuals without sophisticated business experience are aware that policies of insurance contain cuttoff points beyond which claims are not permitted. Submitting claims for insurance benefits is a routine part of adult life–whether for expenses incurred in connection with one's auto, home, apartment, or health." *Moore*, 3 F.Supp.2d at 1247; *see Baldwin Cty. Welcome Center v. Brown*, 466 U.S. 147, 152, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (holding that limitations periods "for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants."); *Adamson*, 44 F.3d at 653 (rejecting argument that limitations period was merely 'too short' as basis of holding analogous statute of limitations unreasonable). Reasonableness does not turn on complexity of the contract, nor on the intelligence of the policy holder, but rather on a determination of whether the contractual limitations period gives the claimant a chance to investigate the claim and exhaust administrative remedies before the time limitation has run, and whether it gives the plan administrator appropriate protection from stale claims. As plaintiff Furleigh has advanced no tenable arguments as to why the provision is unreasonable, the court finds that the three-year contractual limitation period in the Plan is reasonable as it does not foreclose the plaintiff from an opportunity to adequately investigate and pursue claims determination before filing

suit. As a matter of law, the three-year contractual limitations period applies in this cause of action.

### 2. Accrual of plaintiff Furleigh's cause of action

Though the appropriate limitations period is determined by looking to state law, federal law determines when the cause of action accrues. *See Admin. Comm. of Wal–Mart Stores, Inc. v. Soles ex rel. estate of Hollander*, 336 F.3d 780, 782 (8th Cir.2003); *Cavegn*, 223 F.3d at 830; *Bennett*, 141 F.3d at 838; *Union Pac. R.R. Co.*, 138 F.3d at 330. In *Union Pacific Railroad Co. v. Beckham*, 138 F.3d 325 (8th Cir.1998), the Eighth Circuit Court of Appeals determined that absent a contrary mandate from Congress, the 'discovery rule' determines when a cause of action accrues in federal question cases, such as ERISA actions. *Id.* at 330; *Bennett*, 141 F.3d at 839. Therefore, pursuant to the 'discovery rule,' the plaintiff's claim accrues "when a claimant knows or should know through the exercise of reasonable diligence, of the acts constituting the alleged violation." *Alcorn v. Burlington N. R.R.*, 878 F.2d 1105, 1108 (8th Cir.1989). The general rule in ERISA actions is that the cause of action accrues "after a claim for benefits has been made and has been formally denied." *Union Pac. R.R. Co.*, 138 F.3d at 330.

> Thus, a beneficiary cannot successfully argue that he was unaware of an injury after a claim for benefits has been formally denied. Nonetheless, and still consistent with the discovery rule, an ERISA beneficiary's cause of action accrues before a formal denial, and even before a claim for benefits is filed, when there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiary.

*Id.* (citations omitted) (emphasis in original).

The facts of this case closely track those of *Bennett v. Federated Mutual Insurance Company,* 141 F.3d 837 (8th Cir.1998). The *Bennett* court determined that the plaintiff had been given a clear repudiation by a fiduciary where: (1) plaintiff had a copy of the plan which included a forfeiture clause upon termination; (2) plaintiff received a clear repudiation in the form of a letter upon his resignation; and (3) two superiors told the plaintiff that if he resigned he would forfeit his benefits. *Id.* at 839. Similarly, in this case: (1) Furleigh had a copy of the SPD which contained the three-year contractual limitations period on legal actions; (2) before he retired, Furleigh received two letters from Allied's Human Resources department stating that his disability benefits would lapse upon his retirement; and (3) the retirement checklist, which Furleigh signed, clearly stated that his disability benefits would end on July 7, 1995, his chosen date of retirement. Defendants' Appendix, Doc. No. 15 at 0026, 0027, 0031, 0034.

■■■■■■ Therefore, the court finds that Allied and CNA had clearly, and directly, repudiated any claim for benefits after plaintiff Furleigh's retirement. Looking at the facts in the light most generous to the nonmoving party, plaintiff Furleigh's cause of action accrued on July 7, 1995, the date that Furleigh retired and the last day that he was covered under the Plan. The next step is to apply the contractual limitations period to this accrual date. The Plan's contractual limitations period states that a legal action cannot be brought after three years from the date written proof of loss is required. Defendants' Appendix, Doc. No. 15 at 0019. Written proof of loss is required within "90 days after a period for which [defendants Allied and CNA] are liable," or as soon as reasonably possible up to one year after written proof of loss is otherwise required. Defendants' Appendix, Doc. No. 15 at 0019. When the contractual limitations period runs, therefore, turns on the interpretation of the language "end of a period for which we are liable." The interpretation of this language is examined in light of the accrual date of July 7, 1995. It is undisputed that on July 7, 1995, plaintiff Furleigh was sixty years old.

Plaintiff Furleigh argues that because the disability commenced when plaintiff was sixty-one or younger,[15] under the maximum period of benefits payable, defendants are liable under the Plan until the plaintiff reached age sixty-five. Therefore the contractual limitations period began to run on December 24, 1999–plaintiff's sixty-fifth birthday.[16] Based on this date, plaintiff asserts that written proof of loss was required 90 days after his sixty-fifth birthday, March 24, 2000, and the contractual limitations period for filing of a legal action therefore ran out on March 24, 2003.[17]

---

**15.** Though plaintiff Furleigh's argument is predicated on the disability starting in 1990, when the plaintiff was fifty-five years old, plaintiff Furleigh was still in the 'sixty-one or younger' category on July 7, 1995; therefore the logic behind plaintiff's argument is still applicable when considering a July 7, 1995 accrual date.

**16.** The Schedule of Benefits states that where the disability commenced at sixty-one years of age or younger, the maximum period disability benefits are payable is until the claimant's sixty-fifth birthday. Defendants' Appendix, Doc. No. 15 at 0011.

**17.** Plaintiff Furleigh's analysis neglects to incorporate the contract language which allows written proof of loss to be filed within a reasonable time, up to one year after proof of loss would otherwise be due. Essentially, the drop dead date for submission of written proof of loss would be March 24, 2001, or one year after written proof of loss would otherwise need to be submitted on March 24, 2000. Therefore, the dates proffered in plaintiff Furleigh's analysis are incorrect insofar as they to incorporate this language into the analysis.

From this analysis, plaintiff Furleigh's petition filed August 2, 2002 would be timely. Plaintiff's Statement of Disputed Material Facts, Doc. No. 17–1 at ¶ 20. Defendants Allied and CNA ignore the "period for which we are liable" language, and instead assert that written proof of loss requirements are triggered by the onset of the disability, at which time the 180–day elimination period begins to run. Assuming a disability onset date of July 7, 1995, written proof of loss would be required 90 days after the end of the 180 day elimination period on April 12, 1996. Under the terms of the Plan, the plaintiff would have one year from this date, until April 12, 1997, to submit written proof of loss. Therefore, under Defendants' analysis the three-year contractual limitations period expired on March 12, 2000, and plaintiff Furleigh's August 2, 2002 petition was profoundly tardy.[18] Defendants' Brief in Support of Motion for Summary Judgment, Doc. No. 15A at p. 6.

The vast majority of courts interpreting disability insurance plan provisions analogous to those found in the Plan have agreed with plaintiff Furleigh's position that proof of loss need not be submitted until the end of the period for which the insurer is liable under the Plan. *See Hofkin v. Provident Life & Accident Ins. Co.*, 81 F.3d 365, 374 (3d Cir.1996); *Clark v. Massachusetts Mut. Life Ins. Co.*, 749 F.2d 504, 507 (8th Cir.1984); *Liberto v. Mut. Benefit Health & Accident Ass'n*, 323 F.Supp. 1274, 1276 (W.D.Pa.1971); *Meltzer v. Mut. Benefit Health & Accident Ass'n*, 150 F.Supp. 300, 301 (E.D.Pa.1957); *Oglesby v. Penn Mut. Life Ins. Co.*, 877 F.Supp. 872, 886–87 (D.Del.1994); *Laidlaw v. Commercial Ins. Co. of Newark*, 255 N.W.2d 807, 811 (Minn.1977); *Wall v. Penn. Life Ins. Co.*, 274 N.W.2d 208, 213–14 (N.D.

1979); *Panepinto v. New York Life Ins. Co.*, 90 N.Y.2d 717, 723, 688 N.E.2d 241, 244, 665 N.Y.S.2d 385, 388 (N.Y.1997). The Eighth Circuit Court of Appeals in *Clark v. Massachusetts Mutual Life Insurance*, 749 F.2d 504 (8th Cir.1984), in interpreting an analogous provision, recognized that:

> ... the [Plan] itself contemplates that proof of loss may be submitted after [the period of liability] terminates; and at least to some extent difficulty the insurer may have in investigating a disability that has already ended is part and parcel of the insurance agreement.

*Clark*, 749 F.2d at 507. The court finds this line of reasoning persuasive, and applies it to the Plan in question in this case. The concern of some of the courts adopting this interpretation, that the commencement of the statute of limitations could be postponed indefinitely while the insured remains disabled, is not present here, as the Plan only allows for the payment of benefits, at most, until plaintiff Furleigh reached the age of sixty-five where the disability commenced at age sixty-one or younger. *See Panepinto*, 665 N.Y.S.2d 385, 688 N.E.2d at 244. The defendants' analysis would be correct if the language of the provision had required written proof of loss within 90–days of the elimination period; but the provision explicitly requires proof of loss within 90–days of "the end of a period for which the [defendants] are liable." Defendants' Appendix, Doc. No. 15 at 0019.

Applying this interpretation of the Plan provision, the court finds that the contractual limitations period ran on March 24, 2003. Plaintiff Furleigh retired from Allied at the age of sixty. Defendants' Appendix, Doc. No. 15 at 0027. Under the

---

**18.** The court disagrees with the dates calculated by defendants in their analysis for when written proof of loss was due, and therefore when the contractual limitations period would have expired.

terms of the Plan, plaintiff Furleigh had to be totally disabled on, or before, his retirement from Allied. Under an accrual date of July 7, 1995, Furleigh's disability would have commenced when he was sixty years old. Under the Plan, when a claimant becomes disabled at age of sixty-one or younger, the maximum period of benefits payable is until the claimant reaches the age of sixty-five. Therefore, defendants Allied and CNA are "liable" under the Plan until plaintiff Furleigh's sixty-fifth birthday on December 24, 1999. Under the Plan, written proof of loss was due within 90–days after plaintiff Furleigh's sixty-fifth birthday, or March 24, 2000, or as soon as reasonably possible thereafter, up to one year after the time written proof of loss was originally due, or up to March 24, 2001. Therefore, under the contractual limitations provision, and assuming any delay in providing written proof of loss was reasonable, plaintiff Furleigh would have had to file suit within three years from March 24, 2001. Hence, plaintiff Furleigh's filing of the petition on August 2, 2002, was timely and the cause of action is not barred by the contractual statute of limitations. Defendants are not entitled to summary judgment on this point.

### C. Timeliness Of Written Proof Of Loss

Another central issue in the arguments of both parties revolves around the sufficiency, and timeliness of the proof of loss submitted by plaintiff Furleigh. Defendants CNA and Allied rely on the same erroneous interpretation of "end of period for which we are liable" to conclude that the 180–day elimination period began running on July 7, 1995, making written proof of loss due, at the very latest, 90–days plus one year from the end of the elimination period, or April 12, 1997. As discussed above, this is not the appropriate interpretation of this language in the policy. The most reasonable interpretation is that "end of period for which we are liable" means

the end of the period benefits would be paid in this instance, or plaintiff Furleigh's sixty-fifth birthday; proof of loss would therefore be due between March 24, 2000 and March 24, 2001. Undeniably, this delay in submitting proof of loss until nearly six years after the plaintiff's retirement prejudices the defendants' opportunity to conduct a contemporaneous medical examination of the plaintiff to asses his disability status. *de Coninck v. Provident Life and Accident Ins. Co.,* 747 F.Supp. 627, 632 (D.Kan.1990). However, "difficulty the [defendants] may have in investigating a disability that has already ended is part and parcel of the insurance agreement" the defendants themselves composed. *Clark,* 749 F.2d at 507. Written proof of loss was due on March 24, 2000, or as soon as reasonably possible up until March 24, 2001.

The record shows that on October 9, 1999, plaintiff Furleigh called Allied's Human Resources department stating that he wanted to make a claim for LTD benefits. Defendants' Appendix, Doc. No. 15 at 0035. In response, Allied sent plaintiff Furleigh a letter setting forth CNA's current address and stating that time had expired for him to file a claim. Defendants' Appendix, Doc. No. 15 at 0035. Enclosed with this letter was a copy of the SPD in effect at the time of plaintiff Furleigh's employment with Allied. Defendants' Appendix, Doc. No. 15 at 0035. On October 16, 1999, plaintiff Furleigh wrote a letter to Ms. Jill Wedemeyer stating that he would like to make a LTD claim, and requesting defendants Allied and CNA waive any time periods designated in the policy. Defendants' Appendix, Doc. No. 15 at 0036. Plaintiff Furleigh received no response to this inquiry, and only after he wrote a second letter stating his desire to file a claim did he receive a response, and the appropriate claim forms on May 3, 2001. Defendants' Appendix, Doc. No. 15 at 0037–0038. After acquiring counsel,

plaintiff Furleigh submitted appropriate claim forms on July 15, 2001, and later on June 24, 2002, though on both occasions they were incorrectly filled out. Defendants' Appendix, Doc. No. 15 at 0076, 0081.[19]

■ The Plan provides that if CNA does not provide the claimant the appropriate claim forms within 15 days after receiving written notice of the claim, then the requirement of written proof of loss is satisfied so long as CNA receives written proof "describing the occurrence, extent and nature of the loss." Defendants' Appendix, Doc. No. 15 at 0018. The record shows that plaintiff Furleigh's October 16, 1999 correspondence to Allied[20] identified who he was and that he wanted to make a claim. Defendants' Appendix, Doc. No. 15 at 0036. Neither Allied or CNA provided claim forms within 15 days of plaintiff Furleigh's request. When he received no response plaintiff Furleigh wrote a letter on April 23, 2001, to the Vice President of Allied's Human Resources Department stating the incidents he felt evidenced his disability during his employment, set forth

his medical diagnosis and stated that he had not heard from anyone regarding his claim. Defendants' Appendix, Doc. No. 15 at 0037. Therefore, because defendants Allied and CNA failed to provide plaintiff Furleigh with claim forms within fifteen days of his written request, and because defendants received plaintiff's letter describing the alleged incidents and his diagnosis, plaintiff Furleigh is "considered to have met the requirements for written proof of loss."[21] Defendants' Appendix, Doc. No. 15 at 0018.

■ Additionally, because defendants Allied and CNA consistently invited plaintiff Furleigh to submit additional proof, and considered the submissions made by plaintiff Furleigh up to the filing of this suit, the defendants waived compliance with the deadlines for written proof of loss. *See Clark,* 749 F.2d at 507 ("it is irrelevant whether the ninety day deadline specified by the policy for submitting proof of loss was satisfied, since [defendant] consistently invited [plaintiff] to submit additional proof, and never invoked the deadline."); *Burgardt v. Lincoln Nat'l Life Ins. Co.,*

19. Defendants argue that the two separate submissions constitute two separate claims for purposes of determining whether they are timely under the terms of the Plan. The court does not find this argument persuasive. Although the original claim submitted July 15, 2001, was closed for failure to submit properly filled out claim forms, the letter notifying plaintiff Furleigh of its closure specifically states that the claim would be reopened upon receipt of properly filled-out claim forms. Defendants' Appendix, Doc. No. 15 at 0080. Therefore, defendants Allied and CNA considered this whole process as a the continuation of a single claim rather than two separate transactions to which the Plan would apply to each individually.

20. Defendants argue that providing notice of the claim to Allied did *not* constitute notice of the claim to CNA. The court disagrees, and finds that notice to Allied was sufficient to infer notice to CNA based on the language of the Plan. First, the plan provides that Allied

would send any notice of claim it receives to CNA, therefore a claimant could rightly infer that sending notice of a claim to Allied was tantamount to providing notice to CNA. Defendants' Appendix, Doc. No. 15 at 0018. Additionally, the Plan states that claim forms "may be obtained from ALLIED Group Inc.," thereby necessitating notice to Allied rather than CNA. Defendants' Appendix, Doc. No. 15 at 0022. The court determines that plaintiff Furleigh's correspondence with Allied was sufficient to impart notice of the claim on CNA.

21. Despite plaintiff Furleigh's arguments to the contrary, failure by defendants CNA and Allied to timely provide claim forms does not make the contractual limitations period in the Plan irrelevant, or insulate the plaintiff from adverse claim action. Rather it merely excuses the plaintiff from compliance with the written proof of loss deadlines set forth in the Plan.

244 Iowa 456, 56 N.W.2d 15, 17 (Iowa 1952) ("It is well settled that an insurer's denial of liability on grounds other than the failure to furnish proofs of loss is a waiver of right to require such proofs.") (citations omitted); *Schoeman v. Loyal Protective Life Ins. Co. of Mass.*, 239 Iowa 664, 32 N.W.2d 212 (Iowa 1948) (same).

In conclusion, because the defendants failed to provide plaintiff Furleigh with claim forms within fifteen days after he notified them of his claim in writing, under the terms of the policy, plaintiff Furleigh is accorded a finding of compliance with the written proof of loss deadlines under the Plan.[22] Further, as defendants Allied and CNA continuously invited and considered the proof submitted by the plaintiff, the written proof of loss deadlines were waived. Defendants Allied and CNA are not entitled to summary judgment on this matter.

### D. Was Plaintiff Totally Disabled At The Time Of His Retirement?

#### 1. Standard of Review

■ The Plan in this case does not grant the plan administrator, Allied, discretion to determine eligibility. Therefore, the court reviews *de novo* the plan administrator's decision to deny plaintiff Furleigh's claim for LTD benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1095 (8th Cir.1992); *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153–54 (8th Cir.1990), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991).

#### 2. Total disability as defined by the Plan

The SPD defines "total disability"[23] in the following manner:

"Total Disability" means that, during the Elimination Period and Your Occupation Period, You, because of Injury or Sickness, are:

1. continuously unable to perform the substantial and material duties of Your regular occupation;

2. under the regular care of a licensed physician other than Yourself; and

3. not gainfully employed in any occupation for which You are or become qualified by education, training, or experience.

Defendants' Appendix, Doc. No. 15 at 0015. "Elimination Period" is defined further as "the length of time you must be disabled before you are eligible to begin receiving [benefits]." Defendants' Appendix, Doc. No. 15 at 0008. The SPD provides for an Elimination Period of 180 days, and an Occupation Period of 24 months. Defendants' Appendix, Doc. No. 15 at 0011. After LTD benefits have been paid through the 24 month occupation period, to continue receiving LTD payments the claimant must be "continuously unable to engage in any occupation for which YOU are or become qualified by education, training or experience; and ... under the regular care of a licensed physician other than Yourself." Defendants' Appendix, Doc. No. 15 at 0009. The SPD also provides for "Rehabilitative Benefits" where

---

**22.** The court notes that the Plan precludes legal action until "after 60 days following the date written proof of loss was given." Defendants' Appendix, Doc. No. 15 at 0019. The court recognizes, without deciding, that if what plaintiff Furleigh has submitted is not satisfactory proof of loss then the suit was

brought prematurely. *See Clark*, 749 F.2d at 507.

**23.** As plaintiff Furleigh only sought recovery of total disability benefits, the court does not opine as to whether he would have been entitled to any other type of disability benefits available under the Plan.

the claimant's disability "prevents [them] from engaging in [their] former occupation full or part-time, but [they] are able to perform some other work on a full-time or part-time basis for which [they] are suited by previous education, training or experience." Defendants' Appendix, Doc. No. 15 at 0009. The Plan calls for termination of a right to benefits upon retirement of the claimant, though retirement does not affect "covered losses that began before the date of termination." Defendants' Appendix, Doc. No. 15 at 0017.

### 3. Evidence of total disability

The onus is on plaintiff Furleigh to demonstrate that he was totally disabled, as defined by the Plan, on his last day of work with Allied. *See Brown v. Seitz Foods, Inc. Disability Benefit Plan,* 140 F.3d 1198, 1199 (8th Cir.1998) ("to receive benefits, Brown had to show he had become continuously unable to perform the duties of his occupation before he was fired."); *Davidson v. Prudential Ins. Co. of Am.,* 953 F.2d 1093, 1094–96 (8th Cir. 1992) (assigning burden of proving entitlement to LTD benefits to plaintiff Davidson where the policy dictated the benefits would be paid only if plaintiff Davison was "unable to engage in any and every gainful occupation for which he was reasonably fitted for by education, training and experience"). Furleigh must show that he meets the three requirements set out above in order to be 'totally disabled' under the Plan's definition. The critical determination is not whether plaintiff Furleigh is disabled, but *when* he became disabled. *See Cox v. Mid–America Dairymen, Inc.,* 13 F.3d 272, 275 (8th Cir. 1993).

#### a. Continuously unable to perform substantial and material duties of his occupation

■ Interpretation of this requirement of the definition of total disability under the Plan requires the court to look at the Plan's definition of a "Partial Disability":

1. Continuously unable to perform the substantial and material duties of Your regular occupation;

2. Under the regular care of a licensed physician other than Yourself;

3. Gainfully employed in Your regular occupation on a partial and/or part-time basis.

Defendants' Appendix, Doc. No. 15 at 0014. Notably, both "total disability" and "partial disability" under the Plan require a showing that the claimant is "continuously unable to perform the substantial and material duties of [their] regular occupation." Defendants' Appendix, Doc. No. 15 at 0014–0015. All parts of the Plan must be given effect. *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 588 (8th Cir. 2002). Therefore, in order to give effect to both definitions, a claimant of LTD benefits must only show that they are unable to "continuously perform [*all* ] of the substantial and material duties of their occupation," whereas a claimant of partial disability benefits must only be able to show that they are unable to continuously perform *some* of the substantial and material duties of their occupation. *Bond v. Cerner Corp.,* 309 F.3d 1064, 1068 (8th Cir.2002) (arriving at the same conclusion where the contract in question required a showing that claimant was "continuously unable to perform the substantial and material duties of [their] regular occupation" to meet definition of both total disability and partial disability).

■ Therefore, plaintiff Furleigh must show that he was unable to continuously perform *all* of the material and substantial duties of his position as a claims supervisor in order to meet this prong of the total disability definition. In support of his assertion that he was "continuously unable to perform [all] the substantial and material

duties" of his position, plaintiff Furleigh offers his deposition testimony of incidents that occurred during his employment with Allied, as well as his medical records.

*i. Incidents occurring during plaintiff Furleigh's employment.* The first incident occurred during a lunch break at a work seminar Furleigh attended in Des Moines, Iowa. Defendants' Appendix, Doc. No. 15 at 0003. During the lunch break, plaintiff Furleigh's hand quivered. Deposition of Plaintiff Furleigh, pg. 7. This quivering resulted in the damaging of a form, but did not impede Furleigh's ability to eat. Deposition of Plaintiff Furleigh, pg. 7, 9. Coworkers Jim Berg and Geraldine Ford witnessed this event, and plaintiff later told his superintendent Gus Dettman about the incident. Deposition of Plaintiff Furleigh, pg. 8. The second incident occurred in Furleigh's work cubicle. Deposition of Plaintiff Furleigh, pg. 10. In this instance, Furleigh fell down in his cubicle, and had trouble getting up. Deposition of Plaintiff Furleigh, pg. 10. Burns Davidson, a litigation supervisor at Allied, had to help him up. Deposition of Plaintiff Furleigh, pg. 10–11. The third incident occurred when Furleigh was showing the claims department to a new employee, Jerry Dothrup. Deposition of Plaintiff Furleigh, pg. 13. While he was showing Mr. Dothrup around, Furleigh lost his balance and grabbed Eleanor Gilcrest's cubicle wall in order to steady himself. Deposition of Plaintiff Furleigh, pg. 13–14. Ms. Gilcrest was in her cubicle at the time of the incident, and reported the incident to claims manager Bob Boralin and superintendent Randy Eggers. Deposition of Plaintiff Furleigh, pg. 14. When plaintiff met with Mr. Boralin and Mr. Eggers, they "chewed [him] out" because they thought he was harassing Ms. Gilcrest. Defendants' Appendix, Doc. No. 15 at 0145. Furleigh did not inform them that he had grabbed the cubicle wall because he lost his balance, and was experiencing coordination difficulty, or give any alternative reason for his conduct. Finally, plaintiff Furleigh reports that towards the end of his employment, he had trouble writing, in that he would "write real small." Defendants' Appendix, Doc. No. 15 at 0146. Plaintiff also reported that towards the end of his career with Allied, he was having trouble getting his work done due to his inability to take notes and the impediments to his coordination. Deposition of Plaintiff Furleigh, pg. 20. This is evidenced by Furleigh's March 2, 1995 performance appraisal which states: "During 1994, Jack completed only 63% of the required open file reviews." Defendants' Appendix, Doc. No. 15 at 0050. However, in that same time period all of his reviews audited in preparation of the performance appraisal reflected an accurate claims and liability analysis, and he had nearly perfect attendance.

Equally important to the inquiry are the following facts: (1) plaintiff Furleigh continued to work full-time for Allied after each of the incidents, and he continued to work full-time with Allied right up to the day of his retirement; (2) plaintiff Furleigh did not use any of his sick leave after the alleged incidents or the manifestation of symptoms; (3) plaintiff Furleigh had a nearly perfect attendance record in 1994; (4) plaintiff Furleigh never received less than an overall rating of "commendable" on his performance appraisals from 1990 through the time of his retirement; and (5) plaintiff Furleigh reported that he did not have any difficulty driving a car, or reading, before his retirement from Allied. Defendants' Appendix, Doc. No. 15 at 0003, 0040–0051, 0145, 0146; Deposition of Plaintiff Furleigh, pg. 19.

*ii. Medical records.* Pertinent to this inquiry are plaintiff Furleigh's records of medical care occurring before his retirement from Allied. On May 27, 1994, plain-

tiff Furleigh saw his family physician Dr. Dankle due to his declining coordination and difficulty with motor skills. Defendants' Appendix, Doc. No. 15 at 0098. At that time Dr. Dankle observed that the plaintiff's coordination was diminished, and that he experienced some difficulty walking. Defendants' Appendix, Doc. No. 15 at 0098. Though these symptoms were later diagnosed as indicative of ataxia, no specific diagnosis was made at this time. Defendants' Appendix, Doc. No. 15 at 0098. Dr. Dankle recommended a neurological consult, but did not place plaintiff Furleigh on any prescription medications [24] or restrict his activities. Defendants' Appendix, Doc. No. 15 at 0098.

Sometime between the May 1994 visit, and plaintiff Furleigh's next visit to Dr. Dankle on December 12, 1995, plaintiff saw Dr. Woodward, a neurologist at the Mason City Clinic, in Mason City, Iowa. Defendants' Appendix, Doc. No. 15 at 0097. At this time, Dr. Woodward diagnosed the plaintiff as suffering from "alcoholic cerebellar degeneration." Defendants' Appendix, Doc. No. 15 at 0097. Plaintiff has not provided an actual copy of his medical records from his visit with Dr. Woodward, and it is not possible to determine exactly when this visit occurred.

Finally, in a disability form from Ms. Carol G. Dahling, a Disability Representative at Mayo Medical Center, to CNA the following statement was under the 'Disability Information' heading: "On June 21, 2001, Dr. J.E. Ahlskog stated Mr. Furleigh should be considered permanently totally disabled since July 8, 1995." Defendants' Appendix, Doc. No. 15 at 0077. Impor-

tantly, Dr. Ahlskog did not sign or acknowledge this statement on the disability form, nor are any of the medical records of plaintiff's visits to Dr. Ahlskog in 1997 provided to the court. Further, the grounds for this determination of total disability are suspect due to the fact that it purports to conclusively state the plaintiff's disability level a full two years before the plaintiff was ever seen by Dr. Ahlskog.

The evidence proffered by plaintiff Furleigh does not establish that he was unable to perform *all* of the material and substantial duties of his occupation. On and before July 7, 1995, Furleigh was able to work full-time, and satisfactorily perform the material functions of a claims supervisor. Any symptoms that the plaintiff was experiencing did not prevent him from performing the material and substantial duties required of his position. Neither Dr. Woodward or Dr. Dankle placed any restrictions on plaintiff Furleigh's work activities. *See Cox,* 13 F.3d at 275; *Bolling v. Eli Lilly and Co.,* 990 F.2d 1028 (8th Cir.1993); *Ciulla,* 864 F.Supp. at 888. While there was a later statement purportedly from Dr. Ahlskog that plaintiff Furleigh was totally disabled as of July 8, 1995, this statement must be disregarded as: (1) the statement was not authenticated by Dr. Ahlskog; (2) records of plaintiff Furleigh's visits to Dr. Ahlskog were not provided to the court for verification; (3) plaintiff Furleigh did not see Dr. Ahlskog until 1997; and (4) Dr. Ahlskog is not qualified to determine whether plaintiff Furleigh is totally disabled under the terms of the Plan. Though plaintiff Fur-

---

**24.** Defendants place significant emphasis on the fact that no medications were prescribed to plaintiff Furleigh at this time, however this alone does not necessarily mean that no disability existed. At the time, it appears as though there was likely no medication that could be prescribed to alleviate the symptoms plaintiff Furleigh was experiencing. Telling-ly, Dr. Ahlskog, a neurologist at the Mayo Clinic, stated that there was no prescription medication available in *1997*, three years after plaintiff Furleigh's first visit to Dr. Dankle, that would adequately address the lack of coordination and motor skills that the plaintiff was experiencing. Defendants' Appendix, Doc. No. 15 at 0090.

leigh likely experienced the symptoms of ataxia during his employment with Allied, it did not amount to a total disability under the terms of the Plan. The evidence shows that plaintiff Furleigh was capable of performing his duties, and continued to do so until his retirement.

### b. Under the regular care of a licensed physician

▇▇▇▇ To be totally disabled, the Plan requires that the claimant be under the regular care of a physician for the allegedly disabling condition. Defendants' Appendix, Doc. No. 15 at 0015. After December 1995, the medical records evince numerous occasions on which Furleigh consulted with physicians regarding his ataxia, however the pertinent time period for this inquiry is the period Furleigh was employed with Allied up until his retirement on July 7, 1995. It is uncontested that Furleigh visited Dr. Dankle in May 1994, and that he was diagnosed with ataxia by neurologist Dr. Woodward between that time and December 1995. Plaintiff next consulted Dr. Dankle in December 1995, after his retirement. It is difficult to assess whether Furleigh's visits during this time constituted regular care due to the nature of the disease he was afflicted with; ataxia is a progressive neurological disorder for which there is no treatment, ergo frequent doctors visits ay not likely be prescribed or necessary during the early stages of the disease. Notwithstanding concerns about the appropriateness of regular visits for an untreatable, progressive disease, the court finds that the record does not show that plaintiff Furleigh was under regular treatment by a licensed physician for his ataxia during the time he worked at Allied. Plaintiff only saw Dr. Dankle a single time, in May 1994, during his employment with Allied. Though Furleigh *may* have seen Dr. Woodward during his employment with Allied, the record is not complete enough to draw that infer-

ence. The next time that plaintiff Furleigh saw Dr. Dankle was in December 1995, six months after his retirement from Allied, and more than a year and a half after his first visit in May 1994. Such sporadic and inconsistent visits cannot be considered "regular" by any stretch of the imagination. Therefore, plaintiff Furleigh has not met the requirement that he be under the regular care of a licensed physician.

### c. Not employed in any occupation

▇▇▇▇ Furleigh has explicitly failed to meet this element. It is uncontradicted that Furleigh continued to work full-time right up until the date of his retirement with Allied, July 7, 1995. Defendants' Appendix, Doc. No. 15 at 0003. At no time during his employment with Allied did the plaintiff ever request a less demanding position, or work part-time. Plaintiff continued working as a full-time claims supervisor throughout his tenure with Allied. Further, plaintiff Furleigh was able to adequately perform the job requirements for that position up until the time of his retirement. *See* Defendants' Appendix, Doc. No. 15 at 0040–0051 (evidencing that plaintiff Furleigh had never received an overall rating of less than "commendable" from 1990 through 1995). The fact that plaintiff Furleigh was able to continue his full-time employment with Allied as a claims supervisor forecloses his eligibility for total disability benefits under the Plan.

### 4. Plaintiff Furleigh was not totally disabled under the Plan on, or before, the date of his retirement from Allied

▇▇▇▇ The evidence advanced by Plaintiff Furleigh does not demonstrate that he was totally disabled under the Plan at any time during his employment with Allied. Undoubtedly, plaintiff Furleigh began ex-

periencing symptoms of ataxia during his employment with Allied, and *today* his condition has likely progressed to the point where he would meet the definition of total disability under the Plan. However, during Furleigh's employment with Allied, the record does not support a finding of total disability under the Plan. Though plaintiff Furleigh may have operated under the belief that he was disabled during his employment with Allied, "a claimant's state of mind is not necessarily determinative, however, on the issue of whether he or she was disabled under a specific policy." *Ciulla,* 864 F.Supp. at 887 n. 3 (*citing Lackey v. Celebrezze,* 349 F.2d 76, 79 (4th Cir. 1965)). Further, the record is devoid of communication by Furleigh to Allied regarding his symptoms of, or his diagnosis with, ataxia. Plaintiff Furleigh continued to work full-time as a claims supervisor up until his retirement, was able to satisfactorily perform all of the functions of his job, and never mentioned his condition to his employer until years after his retirement. *See Cox,* 13 F.3d at 275. Evidence in the record indicates that if the plaintiff is totally disabled this occurred years after his retirement from Allied. *See de Coninck,* 747 F.Supp. at 632. Plaintiff Furleigh has failed to generate a genuine issue of any material fact that he was totally disabled under the terms of the Plan. Defendants Allied and CNA are entitled to summary judgment.

### III.  CONCLUSION

Though Furleigh's claim for LTD benefits under the Plan was not barred by the contractual limitations period, he has failed to generate a genuine issue of material fact that he was disabled at, or before, his retirement from Allied. Therefore, the court grants Allied's and CNA's motion for summary judgment. The trial in this matter set to begin on November 17, 2003, is cancelled.

**IT IS SO ORDERED.**